**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **GANESS & VENA MAHARAJ** | ) | **Case No. 09-15777-SSM** |
| | ) | **Chapter 11** |
| **Debtors** | ) | |
| | ) | |
| | ) | |

**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE
BANKRUPTCY CODE FILED BY GANESS AND VENA MAHARAJ**

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ABOUT THE TAX OR THE LEGAL EFFECTS OF THE PLAN ON CREDITORS. ANY REPRESENTATIONS (OTHER THAN THOSE CONTAINED HEREIN) MADE TO INDUCE VOTING SHOULD BE REPORTED TO THE COURT AND OFFICE OF THE UNITED STATES TRUSTEE. CREDITORS ARE URGED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISORS CONCERNING THE CONSEQUENCES OF THE PLAN.

December 14, 2010

_____
Ann E. Schmitt, VSB No. 22030
Culbert & Schmitt, PLLC
30C Catoctin Circle, SE
Leesburg, VA 20175
(703) 737-6377
Counsel for the Debtors

# TABLE OF CONTENTS

ARTICLE I.   DISCLOSURE STATEMENT SUMMARY

     1.01     Voting Procedure……………………………………………..…1
     1.02     Approval of Disclosure Statement …………………......................1
     1.03     Information Regarding Disclosure Statement ………......................1

ARTICLE II.   DEFINITIONS………………………………………………2

ARTICLE III. PURPOSE OF DISCLOSURE STATEMENT……….........................6

     3.01     Introduction………………………………………………..6
     3.02     Brief Explanation of Chapter 11…………………………………7
     3.03     Approval of Disclosure Statement……..…………………………7
     3.04     Confirmation of a Chapter 11 Plan…………………………….7
     3.05     Voting on Plan……………………………………………..8
     3.06     Failure to Vote……………………………………………..9
     3.07     The Confirmation Hearing…………………………………9
     3.08     Effect of Confirmation……………………………………….9

ARTICLE IV. BACKGROUND INFORMATION…………………………………9

     4.01     The Pre-Petition Debtors…………………………………..........9
     4.02     Significant Events During Chapter 11 Case ……..…..……… 12

ARTICLE V.   DEBTORS' ASSETS……………………………………………13

     5.01     Poland Road Property ………………………………..…13
     5.02     D&V Properties, LLC……………………………………....13
     5.03     D&V, Inc………………………………………………13
     5.04     Vehicles………………………………………………13
     5.05     Other Personal Property………………………………………13

ARTICLE VI. DEBTORS' LIABILITIES……………………………....……13

     6.01     Administrative Claims……………………………………13
     6.02     Access Secured Claim……………………………………14
     6.03     Claims of Wells Fargo, Wells Fargo, Trustee, DB and
             Nationstar……………………………………………14
     6.04     Claim of Acura Financial Services…………………………14
     6.05     Unsecured Claim of Access…………………………………14
     6.06     Other Unsecured Claims………………………………....14
     6.07     Objections to Claims…………………………………….14

ARTICLE VII. MISCELLANEOUS INFORMATION……………………………..14

    7.01           Operating Reports………………………………………..14
    7.02           Insider Claims………………………………………..…..14
    7.03           Schedules and Disputed Claims……………………..……14
    7.04           Future of Debtors………………………………………...…14

ARTICLE VIII. SUMMARY OF PLAN………………………………………..15

    8.01           Unclassified Claims………………………………....…..15
    8.02           Classification of Claims………………………………..…15

ARTICLE IX. TREATMENT OF CLAIMS………………………………….…..15

    9.01           Class 1—Secured Claim of Access………………………..…15
    9.02           Class 2—Secured Claim of Acura Financial Services………..15
    9.03           Class 3—All General Unsecured Creditors……………………15
    9.04           Class 4—Unsecured Claim of Access…………………………15
    9.05           Access Notes………………………………………………..15
    9.06           Acceleration of Payments………………………………………16
    9.07           Classes Entitled to Vote…………………………………………16
    9.08           Unclassified Claims……………………………………………16

ARTICLE X. EXECUTION AND IMPLEMENTATION OF THE PLAN……………....16

    10.01         Source of Funding………………………………………….16
    10.02         Default……………………………………………………….16
    10.03         Executory Contracts ………………………………………..16
    10.04         Objection to Claims………………………………………….16
    10.05         Further Documents and Actions……………………………..16
    10.06         Additional Requirements of the United States Trustee…..………17
    10.07         Post-confirmation Management………………………………17
    10.08         Manner of Payment Under the Plan………..…………………17
    10.09         Time Bar to Cash Distribution Checks…………………………17

ARTICLE XI. EFFECT OF CONFIRMATION……………………….…………......17

    11.01         Injunction……………………………………………………17
    11.02         Allowance of Claims…………………………………………18
    11.03         Binding Nature………………………………………………18

ARTICLE XII. RETENTION OF JURISDICTION…………………………….......18

ARTICLE XIII. CONSIDERATIONS IN ACCEPTING THE PLAN…………………20

13.01        Impairment…………………………………………………………20
13.02        Acceptance…………………………………………………………20
13.03        Other Requirements for Confirmation…………………………...20
13.04        Confirmation Over Rejection by a Class of Creditors…………...20

ARTICLE XV.  RISK FACTORS…………………………………………………………21

ARTICLE XVI.  TAX CONSEQUENCES…………………………………………………...21

ARTICLE XVII.  LIQUIDATION ANALYSIS………………………………………………...21

CONCLUSION…………………………………………………………………………22

# ARTICLE I
## DISCLOSURE STATEMENT SUMMARY

The following is a brief summary of certain information contained in this Disclosure Statement.  This summary is incomplete and selective and is qualified in its entirety by more detailed information contained herein. Definitions of the capitalized terms are found in Article II.

1.01.  <u>Voting Procedure.</u>  An entity entitled to vote on the Plan must indicate its acceptance or rejection of the Plan on the ballot that accompanies this Disclosure Statement.  In order for a vote to count, the ballot must be received no later than 5:00 p.m., Eastern Time, _____ at the address shown on the ballot.

For the Plan to be confirmed, it must be accepted by at least one class of Impaired Claims.  Section 1124 of the Bankruptcy Code sets forth whether a Claim is Impaired.  An Impaired class of Claims accepts the Plan if at least two-thirds in amount and more than one-half in number of the Allowed Claims in the class that are actually voted, are cast in favor of the Plan.

1.02.  <u>Approval of Disclosure Statement.</u>  This Disclosure Statement has been determined by the Bankruptcy Court to contain information of a kind and in sufficient detail to enable a reasonable, hypothetical investor typical of holders of Impaired Claims to make an informed judgment concerning the Plan.  **THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION BY THE BANKRUPTCY COURT EITHER FOR OR AGAINST THE PLAN. BANKRUPTCY COURT APPROVAL MERELY CONFIRMS THAT THE INFORMATION CONTAINED HEREIN IS SUFFICIENT TO ALLOW YOU TO MAKE AN INFORMED JUDGMENT IN CASTING YOUR BALLOT.**

**In the event of any inconsistencies between the Plan and contents of this Disclosure Statement, the Plan shall control.**

1.03.  <u>Information Regarding Disclosure Statement</u>.  No representations concerning the Debtors, the Debtors' operations, the value of the Debtors' property or the Plan are authorized unless they are in this Disclosure Statement.  This Disclosure Statement is the only statement with respect to the Plan.  No other representation concerning the Debtors, their business operations or the value of their property has been authorized.  You should rely only on the representations or inducements contained in this Disclosure Statement.  You should report any additional representations and inducements to the Court, counsel for the Debtors, or Office of the United States Trustee.

The Debtors have endeavored to be accurate in this Disclosure Statement in all respects.  Although the Debtors believe that the contents of this Disclosure Statement are complete and accurate, the Debtors are not able to warrant or represent that the information contained herein is without inaccuracy.

# ARTICLE II
## DEFINITIONS

As used in the Disclosure Statement and Plan, the following terms have the respective meanings specified below (such meanings to be equally applicable to both the singular and plural, and masculine and feminine forms of the terms defined):

*Access* means Access National Bank.

*Administrative Bar Date* means the date forty-five (45) days after the Confirmation Date.

*Administrative Claim* means a Claim for payment of costs or expenses of administration specified in Sections 503(b) and 507(a)(1) and (b) of the Bankruptcy Code, other than a Fee Claim.

*Allowed* means a Claim, Administrative Claim, or Priority Tax Claim: (a)(i) proof of which has been timely filed with the Bankruptcy Court or has been deemed timely filed by a Final Order, or if no such proof is filed, which has been scheduled by the Debtors in the Schedules other than as a disputed, contingent or unliquidated, and (ii) as to which no party in interest has timely filed an objection, filed a motion to equitably subordinate, or otherwise sought to limit recovery within the time limits specified in this Plan or permitted by the Bankruptcy Court, or (b) which is allowed by a Final Order of the Bankruptcy Court.

*April 9, 2009 Note* means the promissory note dated April 9, 2009 in the original amount of $500,000,, payable to Access, as modified and amended, executed by D&V Properties, LLC and guaranteed by the Debtors and by D&V, Inc..

*Ballot* means the form transmitted to Creditors for voting to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code.

*Bankruptcy Code* means Sections 101 *et seq.* of Title 11 of the United States Code, as now in effect or hereinafter amended.

*Bankruptcy Court* means the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure, as amended from time to time, and the local rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases.

*Bar Date:* "Bar Date" means November 30, 2009 for all entities other than governmental entities, and January 19, 2010 for governmental entities.

**Borrowers** means the Debtors, D&V and DVP.

**Business Day** means any day other than Saturday, Sunday or a "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

**Cash** means cash and cash equivalents in lawful currency of the United States of America, including, but not limited to, bank deposits, checks, and other similar items.

**Causes of Action** means any and all claims, causes of action, demands, rights, actions, suits, damages, injuries, remedies, accounts, powers, privileges, licenses, and franchises of the Debtors of any kind or character whatsoever, known, unknown, accrued or to accrue, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or under any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise.

**Case** means this case (No. 09-15777-SSM) concerning the Debtors, which is being administered by the Bankruptcy Court under Chapter 11 of the Bankruptcy Code.

**Claim** means a claim against the Debtors, as such term is defined in Section 101(5) of the Bankruptcy Code.

**Class** means a Claim or a group of Claims as classified under the Plan.

**Commercial Property** means the real property and improvements thereon located at 23550 Overland Drive, Dulles, Virginia and owned by DVP.

**Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

**Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

**Creditor** means an entity that holds a Claim.

**C&S** means Culbert & Schmitt, PLLC, counsel for the Debtors.

**DB** means DB Structured Products or such other entity which filed or currently holds Claim Number 8 asserting a secured claim in the amount of $682,086.41.

**Debtors**  means Ganess and Vena Maharaj.

**Debtors' Business** means D& V Property, LLC and D&V, Inc., the real estate holding company and corporation which operates D&V Autobody respectively.

**Disclosure Statement** means the Disclosure Statement respecting this Plan approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

**Disputed Claim** means a Claim (or any portion thereof) as to which: (a) an objection has been timely filed, and such objection has not been: (i) withdrawn, or (ii) overruled or denied in whole by a Final Order; (b) before the deadline for an objection to the Claim to be filed, the amount of the Claim specified in the applicable proof of Claim exceeds the amount of any corresponding Claim scheduled by the Debtors in their Schedules or such Claim is scheduled as disputed, contingent or unliquidated by the Debtors; (c) there is a dispute as to classification of the Claim; (d) there is a dispute as to the estimated amount of such Claim under Section 502(c) of the Bankruptcy Code; (e) the Claim is contingent or unliquidated; (f) the Claim is subject to dispute, contest, offset, setoff, recoupment, defense, or counterclaim asserted in an adversary action or contested matter under the Bankruptcy Court at the time of any Distribution pursuant to Section 502(d) of the Bankruptcy Code or otherwise applicable law; or (g) the Claim is not otherwise an Allowed Claim.

**Distribution** means the distribution of Cash in accordance with the Plan.

**Distribution Address** means the last known address of a Creditor whether derived from the Schedules, a proof of Claim filed with the Bankruptcy Court, a notice of transfer of Claim filed pursuant to Bankruptcy Rule 3001(e), or other written notification to the Debtors concerning where a Distribution under the Plan is to be sent.

**D&V** means D&V, Inc., also known as D&V Autobody.

**DVP** means D&V Properties, LLC, formerly known as Loudoun Accommodation Services, LLP.

**Effective Date** means the date when the Confirmation Order becomes a Final Order.

**Executory Contract** means any executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code in effect between the Debtors and another entity as of the Petition Date.

**Final Order** means an order or judgment, as entered on the docket of the applicable court, that has not been reversed, modified or amended, is not stayed and as to which the time to appeal or to seek review or rehearing or petition for certiorari has expired without an appeal or application for review or rehearing or petition having been filed.

*Haymarket Property* means that real property with improvements previously owned by the Debtors and located at 15711 Hunton Lane, Haymarket, Virginia.

*Impaired* means any Class or any Claim in a Class, that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

*Initial Distribution Date* means the date of the first distribution to classified Creditors under the Plan, which shall occur ninety (90) days after the Effective Date.

*Lien* means "lien" as defined in Section 101(37) of the Bankruptcy Code.

*Loan Agreement* means the June 5, 2006 Note, the April 9, 2009 Note, the deed of trust securing the June 5, 2006 Note, all guarantees, security agreements and any other documents relating to the June 5, 2006 Note and the April 9, 2009 Note.

*June 5, 2006 Note* means the promissory note dated June 5, 2006 payable to Access, in the original principal amount of $4,345,000, as modified and amended, executed by the Debtors and guaranteed by D&V and DVP.

*Nationstar* means Nationstar Mortgage, As Servicer For U.S. Bank National Association, Not In Its Individual Capacity But Solely For The Holders Of Maiden Lane Asset Backed Securities I Trust 2008-1, or such other entity which filed or currently holds proof of claim number 4 based upon a promissory note dated March 29, 2007 in the original principal amount of $115,050.

*Plan* means this Plan under Chapter 11 of the Bankruptcy Code as the same may be altered, amended, or modified from time to time in accordance herewith (but after the Confirmation Date, such amendments or modifications being effective only if approved by order of the Bankruptcy Code.)

*Petition Date* means July 21, 2009.

*Poland Road Property* means Debtors' residence located at 25872 Poland Road, Chantilly, Virginia.

*Practical* means feasible under the circumstances, but no later than thirty (30) days after the specified date or action.

*Pre-petition* means an event, occurrence or other thing first arising prior to the Petition Date.

*Priority Tax Claim* means any Unsecured Claim to the extent entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

*Projected Disposable Income* shall have the meaning set forth in Section 1325(b)(2) of the Bankruptcy Code, and for purposes of this Plan, is $1,000 per month or such other amount as may be determined by the Court.

*Quarterly Fees* means the quarterly fees owed to the Office of the United States Trustee pursuant to 28 U.S.C. section 1930.

*Schedules* means the schedules, as may be amended from time to time, of assets and liabilities filed by the Debtors with the Bankruptcy Court in accordance with Sections 521 and 1106(a)(2) of the Bankruptcy Code

*Secured Claim* means any Claim to the extent such claim constitutes a secured Claim pursuant to Sections 506 or 1111(b) of the Bankruptcy Code.

*Unsecured Claim* means any Claim which is not secured by property of the Debtors and which is not entitled to priority under the Bankruptcy Code.

*Unsecured Claim of Access* means amounts due under the April 9, 2009 Note.

*Wells Fargo* means Wells Fargo Bank, N.A. and/or Wells Fargo Funding, Inc. or such other entity which holds the notes dated March 29, 2007 and filed Claim Number 7 in the amount of $115,174.04 and Claim Number 14 in the amount of $637,126.12.

*Wells Fargo, Trustee* means the holder of Claim Number 15 in the amount of $652,977.47 filed by EMC Mortgage Corporation, as Servicer for Wells Fargo Bank as Trustee for Certificate Holders of Bear Stearns Asset Backed Securities 1 LLC, Series 2007-AC5.

Any term in this Disclosure Statement that is not defined herein, and that is used in the Bankruptcy Code, shall have the meaning assigned to such term in the Bankruptcy Code.

### ARTICLE III
### PURPOSE OF DISCLOSURE STATEMENT
### AND PROCEDURE FOR CONFIRMATION

3.01.  <u>Introduction</u>.  This Disclosure Statement has been prepared by the Debtors and is intended for all known Creditors entitled to vote on their Plan.  The purpose of this Disclosure Statement is to provide information that the Bankruptcy Court has determined to be materially important or necessary for Creditors to make informed decisions in voting to accept or reject the Plan.  A copy of the Plan is attached to this Disclosure Statement.  The Plan sets forth the proposal of the Debtors for satisfying all pre-petition Claims and all post-petition Administrative Expenses.

The information contained herein has not been subject to an audit.   No representations concerning the Debtors or the Plan are authorized other than as set forth

in this Disclosure Statement.  Any representations or inducements made by any person to secure your vote, other than those contained herein, should not be relied upon.

The Debtors have endeavored to be accurate in this Disclosure Statement in all material respects.  Although the Debtors have used their best efforts to ensure that the contents of this Disclosure Statement are complete and accurate, the Debtors are not able to warrant or represent that the information contained herein is without inaccuracy.

3.02.   <u>Brief Explanation of Chapter 11.</u>  Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, however, Chapter 11 does permit the liquidation of all or a portion of a Debtors' estate as part of a plan.  Pursuant to Chapter 11, the Debtors have been authorized to reorganize their financial affairs for their own benefit and that of their Creditors and other interested parties.  Attempts at collection of Claims arising before the Petition Date against the Debtors and attempts to foreclose upon their property have been stayed during the Case, and the Debtors have managed their financial affairs as Debtors-in-possession.

Formulation of a plan of reorganization (or liquidation) is the principal purpose of a Chapter 11 case and the Debtors' Plan is the vehicle for settling all Claims against the Debtors.  The Debtors filed their Plan on November 18, 2010.

3.03.   <u>Approval of Disclosure Statement.</u>  As required by the Bankruptcy Code, this Disclosure Statement has been presented to and approved by the Bankruptcy Court.  This approval means that the Bankruptcy Court has determined that this Disclosure Statement contains adequate information to enable Creditors eligible to vote on the Plan to make informed judgments concerning the Plan, but approval does not constitute a judgment by the Bankruptcy Court about the desirability of the Plan or the value of any consideration offered pursuant to the Plan

3.04   <u>Confirmation of a Chapter 11 Plan.</u>  There are two methods by which the Plan can be confirmed: (1) the "acceptance" method, in which all Impaired classes of Claims have voted in the requisite amounts to accept the Plan and (2) the "nonacceptance" or "cramdown" method, in which at least one class of Impaired Claims has voted in the requisite amounts to accept the Plan and certain other requirements are met with respect to the Debtors and all other Impaired classes of Claims.

A Claim that will not be repaid in full on the Effective Date or with respect to which the legal rights are altered, or an interest that is adversely affected, is "Impaired".  A holder of a Claim in an Impaired class under the Plan is entitled to vote to accept or reject the Plan if such Claim has been Allowed or is deemed Allowed under Section 502 of the Bankruptcy Code, or is temporarily Allowed for voting purposes under Rule 3018 of the Bankruptcy Rules.  In order for a class of Claims to vote to accept the Plan, votes representing at least two-thirds in amount and more than one-half in number of Claims actually voted in that class must be for acceptance of the Plan.

Section 1129(b) of the Bankruptcy Code provides that a Chapter 11 plan may be confirmed notwithstanding its rejection by one or more Impaired classes if certain requirements are met.  First, with respect to each Impaired class of Claims that has not accepted the Plan, the Court must determine that each such class will receive or retain property of value not less than the amount such holders would receive if the Debtors were liquidated under Chapter 7.  Second, the Court must find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Impaired class that does not accept the plan.  With respect to a class of Allowed Unsecured Claims, the Bankruptcy Code requires that the value of property to be distributed under the plan is not less than the disposable income of the debtor(s) (as defined in section 1325(b)(1) of the Bankruptcy Code) to be received by the debtor(s) during the five year period beginning on the date that the first payment is due under the plan.

3.05.  _Voting on Plan._  Each Impaired Creditor may vote on the Plan.  Subject to the specific provisions of Section 1124 of the Bankruptcy Code, a Creditor with an Impaired Claim or Interest is deemed to include any Creditor that will receive less than full Cash payment for the allowed amount of its Claim on the Effective Date of the Plan. The holders of Claims that may be disputed by the Debtors may vote on the Plan only to the extent that their Claims are allowed by the Bankruptcy Court for the purpose of voting.

The Ballot attached to this Disclosure Statement is not a proof of Claim.  The Schedules filed by the Debtors and proofs of claim filed by Creditors may be inspected at the Bankruptcy Court (or at its web site: www.vaeb.uscourts.gov) and are also available from counsel for the Debtors.  Only those votes that actually accept or reject the Plan will be counted.

In order to vote by mail, a Creditor must complete the ballot accompanying this Disclosure Statement and send it to be received not later than 5:00 p.m., Eastern Time, on _____ at the following:

        Mailing:                 Ann E. Schmitt
                                    Culbert & Schmitt, PLLC
                                    30 C Catoctin Circle, S.E.
                                    Leesburg, Virginia 20175

        Electronic mail:        aschmitt@culbert-schmitt.com

        Facsimile:              703-737-6370
                                    Attention: Ann Schmitt

PLEASE REVIEW THIS DISCLOSURE STATEMENT CAREFULLY AND COMPLETE AND RETURN THE ACCOMPANYING BALLOT. YOUR VOTE IS IMPORTANT.

3.06.  <u>Failure to Vote.</u>  If you are entitled to vote and do not, the ballots will be counted as though your Claim does not exist.  If the Court approves the Plan, you will be bound by its terms regardless of how your Claim is treated or whether or not you voted if the Plan is confirmed.

3.07.  <u>The Confirmation Hearing.</u>  The Bankruptcy Court has scheduled a hearing on Confirmation on the Plan to commence on _____ at the Bankruptcy Court  in Alexandria, Virginia.  At that hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether the Plan is in the best interests of Creditors who are entitled to vote to accept or reject the Plan.  The Bankruptcy Court also will receive and consider a summary of ballots concerning the votes cast for acceptance or rejection of the Plan by the Creditors entitled to vote on the Plan.

3.08. <u>Effect of Confirmation.</u> If the Court confirms the Plan, except as set forth in the Plan, Creditors may no longer pursue or enforce Claims against the Debtors that existed before the Petition Date.

## ARTICLE IV
## BACKGROUND INFORMATION

4.01    <u>The Pre-Petition Debtors:</u>

**Financing and Construction of the Commercial Facility**

Since 1988, Debtors have operated an autobody business through D&V.  Until 2007, the business operated from the Poland Road Property.

In December 2004, the Maharajs and several owners of adjoining properties entered into contracts with Centex Homes (*"Centex"*) to sell a 21 acre assemblage.  The purchase price for the Poland Road Property was $2,100,000.  In anticipation of closing on the Centex contract, the Debtors purchased a new home in Haymarket, Virginia for $1,500,000 and began work to acquire and build a new commercial facility which would house an expanded autobody business.  The Maharajs established DVP to acquire the real property and DVP and the Maharajas executed the June 5, 2006 Note, a $4,345,000 credit line agreement with Access.  The June 5, 2006 Note is secured by a deed of trust encumbering the Poland Road Property and the Commercial Property.

The Access loan required a pay down of $1,000,000 from the proceeds of the sale of the Poland Road Property to Centex. However, in July 2006, Centex notified the Maharajs and the other property owners that it would not close on the contract(s).  Without the $1,000,000 payment, there were insufficient funds in the Access loan to complete construction of the new facility. The Maharajs sought additional funding from other lenders, however because the Access deed of trust encumbered all of the assets available to the Maharajas, traditional financing was not available.  In February or March 2007, Ganess Maharaj was introduced to Vijay Taneja  and Financial Mortgage, Inc.

(*"FMI"*). When Mr. Maharaj met with Mr. Taneja, he assured Mr. Maharaj that FMI could and would provide the necessary construction funding.   However when the Maharajas went to the FMI offices to execute the loan agreement, Taneja insisted that they first refinance the Poland Road Property.   On March 17, 2007, Ganess Maharaj executed two deed of trust notes payable to FMI, one in the amount of $613,600 (*"$613,600 Note"*), the second for $115,050 (*"$115,050 Note"*)(jointly the *"Notes"*). From the proceeds of the Notes, FMI wired $369,000 into the Maharajs bank account and paid off a first and second deed of trust held by Bank of America.   The Maharajs used the funds received from the financing to pay construction and bonding costs associated with the new D&V facility being constructed on the Commercial Property.

On May 9, 2007, the Maharajs executed a $2,300,000 credit line deed of trust note and loan agreement *("Construction Loan")* with FMI, together with a Deed of Trust, Assignment of Leases and Security Agreement, securing the Construction Loan by a deed of trust on the Residence. Over the next nine months, FMI advanced approximately $1,400,000 under the Construction Loan, all of which was used to fund the construction of the Commercial Facility.

## FMI Fraud

Unknown to the Maharajs, Mr. Taneja and FMI were involved in an elaborate fraudulent scheme whereby Mr. Taneja induced borrowers sign multiple promissory notes with each loan closing.  These "original" notes were then sold to various lenders, each of which believed it had the sole original note, secured by a first (or in some cases a second) deed of trust.

Following the March 2007 refinancing of the Poland Road Property, the Maharajs received written notification from FMI that the Notes had been sold to Wells Fargo. Wells Fargo send the Maharajs monthly billing statements, which the Maharajs paid.  In May, 2007, the Maharajs received mortgage statements from two other lenders.  Mrs. Maharaj called FMI and was told that these statements were in error. FMI confirmed that the Notes had been sold to Wells Fargo and told the Debtors to make payments only to Wells Fargo. They were told FMI would take care of the mistake with the other lenders. No additional statements were received. The Maharajs subsequently learned that during the March 2007 closing, Ganess Maharaj had executed three identical notes in the amount of $613,600 and two notes in the amount of $115,050.  All of these notes had been sold.

On or about August 31, 2007, Kamran M.  Khan, who represented that he was acting on behalf of FMI, asked the Maharajs to sign some additional papers which he said had inadvertently been missed at the prior closings   The Maharajs subsequently discovered that these "additional papers" were, in fact, a new financing, including a $613,000 Note and deed of trust.  As of the date of this Disclosure Statement, Debtors do know whether this note(s) was sold, and no lender has ever made demand under an August 31, 2007 note. However a deed of trust dated August 31, 2007 remains of record in Loudoun County.

On November 23, 2007, Mr. Taneja told Vena Maharaj she needed to sign additional papers in connection with a requested draw under the Construction Loan. She met him at a gas station and signed several papers. Months later she discovered that the "papers" she had signed were the signature pages for another promissory note. This note, in the amount of $615,000 was subsequently sold to GMAC Mortgage, LLC ("*GMAC"*). The deed of trust which secures the GMAC note, was never recorded. Debtors believe this note provided the financing to repay the August 31, 2007 note.

By the Spring of 2008, many of the lenders had discovered FMI's fraudulent activity. Wells Fargo filed suit and in connection with that suit, "froze" the FMI bank accounts. Shortly thereafter, FMI and Mr. Taneja filed for relief under chapter 11 the Bankruptcy Code.

### Multiple Demands for Payment

Shortly after the filing of the FMI bankruptcy case, the Maharajs began receiving mortgage billing statements from lenders claiming to hold notes secured by the Poland Road Property. In addition to Wells Fargo, these lenders were GMAC, MidFirst (as servicer for HSBC), and EMC Mortgage (servicer for US Bank and on information and belief, for Wells Fargo Bank, N.A. as Trustee for Certificate Holders of Bear Stearns Asset Backed Securities I LLC, Series 2007-ACS.) Faced with multiple demands for payment and threats of foreclosure, the Marahajs filed a declaratory judgment complaint in the FMI bankruptcy, designated as Adversary Proceeding No. 08-1344-SSM, seeking a determination as to which lenders held enforceable notes and deeds of trust on the Poland Road Property ("*FMI Litigation"*). Discovery in the FMI Litigation established that monthly statements from these additional lenders had been addressed to the Maharajs at FMI's business address at 11211 Waples Mill Rd, Suite 200, Fairfax, VA 20030. Payments were generally made from the account of NRM Investments, Inc., an affiliate of FMI.

Prior to trial, the Maharajs filed this chapter 11 case, and by consent of all of the parties, the FMI Litigation was dismissed, it being the intention of the parties that the various obligations would be addressed in the Maharaj bankruptcy.

### FMI Settlement and Access Financing

As part of the FMI Litigation, Debtors reached a settlement with the FMI trustee, H. Jason Gold, regarding amounts due under the Construction Loan. The FMI bankruptcy estate was paid $400,000 in full satisfaction of the $1,400,000 owed under the Construction Loan. Funding was provided by Access under the April 9, 2009 Note. DVP is the borrower under this note, which is guaranteed by the Debtors and D&V. This note is secured by a lien on all of the D&V assets.

**Haymarket Property**

When Centrex notified the Debtors that it would not close on the purchase of the Poland Road Property, Debtors attempted to sell the Haymarket Property.  The property was offered for sale just as the real estate market was beginning its steep decline. Debtors made mortgage payments for some time, but ultimately were unable to carry the cost of this property and the amounts due to Access.  They defaulted on the mortgage debt due to Branch Banking & Trust Company (*"BB&T"*) and in December 2008, BB&T foreclosed.  On their schedules, listed the deficiency due to BB&T as $461,000.  BB&T has not filed a proof of claim.

4.02    Significant Events During the Chapter 11 Case:

        4.02(a)    Employment of Professionals:

                Culbert & Schmitt, PLLC:  By order entered September 8, 2009, the Court approved the retention of C&S as bankruptcy counsel for the Debtors.  By order entered March 17, 2010, the Bankruptcy Court approved fees and expenses in the amount of $8,304 covering the period from the Petition Date to February 5, 2010.

        4.02(b)    Motions for Relief from Stay.

                Wells Fargo, DB and GMAC filed motions for relief from stay seeking leave to foreclose on the Poland Road Property. All motions were withdrawn prior to the scheduled hearings.

                In August, 2010, Nationstar filed a motion for relief from stay seeking leave to foreclose on the Poland Road Property.  As of the date of this Disclosure Statement, this motion was still pending.

        4.02(c)    Motion to Approve Modification of the Loan(s) to Access Bank.  By order entered on February 18, 2010, the Court approved Debtors' motion to modify the Loan Agreement. The modification reduces the interest rate and  monthly payments on the June 5, 2006 Loan and the April 9, 2009 Loan.

        4.02(d)    Complaint to Void Liens.  Debtors have filed an adversary proceeding seeking a determination that the claims held by Wells Fargo, Wells Fargo, Trustee, DB, and Nationstar are unsecured, because the value of the collateral which secures this claim (the Poland Road Property) is less than amounts owed to Access, which holds a more senior lien.

4.02(e)   Objections to Claims.  Debtors filed objections to the claims filed by H. Jason Gold as trustee for FMI, Taneja, Taneja Center, Inc., NRM Investments, Inc.  and Elite Entertainment, Inc.. In each case the claim amount was listed as "unknown". Consent orders have been entered disallowing each of these claims.

## ARTICLE V
## DEBTORS' ASSETS

5.01   Poland Road Property**:** The Poland Road Property has been Debtors' residence since 1986 and has an appraised value of $450,000.

5.02   D&V Properties, LLC**:**  DVP's sole asset is the Commercial Property, which has an appraised value of $2,500,000, and is encumbered by the Access deed of trust securing a $3,540,498 claim.  DVP has also guaranteed the April 9, 2009 Note, having a balance of $477,806.

5.03   D&V, Inc.:  D&V is the operating entity which owns the autobody business.  The most recent Statement of Revenue and Expenses is attached as Exhibit 1. The largest expenditure is the payment of rent, which is paid to DVP and is used by DVP to make payments on the two Access loans.  Additional rent is reflected in the "Taxes-Other" category, which is a pass through of real estate taxes.  DVP intends to contest the property assessment and it is anticipated that the amount of the real estate taxes will be reduced starting in 2011.

5.04   Vehicles:  Debtors own three vehicles, a 1982 Ford Pick up of negligible value, a 2001 Lexis IS 300 valued at $7,500, a 1999 BMW M-3, valued at $14,300  and a 2007 Acura TSX Sedan valued at $18,000.  The Acura is in the name of Ganess Maharaj, but Debtors' daughter drives the vehicle and has made the vehicle payments.

5.05   Other Personal Property:   Debtors' other assets consist of jewelry valued at approximately $20,000 (much of it family heirlooms), life insurance policies with cash surrender values of $2,700 and a NY Life annuity having a value of $26,371.

## ARTICLE VI
## DEBTORS' LIABILITIES

6.01   Administrative Claims:  The only know administrative claim is for fees and costs of Debtors' counsel, C&S. It is estimated that fees and expenses through confirmation will be approximately $20,000.  C&S hold a retainer in the approximate amount of $9,000.

6.02    <u>Access Secured Claim</u>:  Access holds a first deed of trust on the Poland Road Property which secures a claim having a principal amount of $3,090,181, plus deferred late fees in the approximate amount of $300,000 and a deferred origination fee in the amount of $126,077.  This claim is guaranteed by D&V and DVP.

6.03    <u>Claims held by DB, Nationstar, Wells Fargo and Wells Fargo, Trustee</u>.  Claims held by these creditors where secured by a second or third deed of trust on the Poland Road Property as of the Petition Date. The Poland Road Property has an appraised value of  $435,000, substantially below the amount due to Access under the first trust.  Accordingly, there is no value in the Poland Road Property which secures the second and third trusts, and DB, Nationstar, Wells Fargo and Wells Fargo Trustee are classified as Class 3 Creditors under this Plan.  The confirmation order will specifically provide that the liens (deeds of trust) which secured these claims shall be released.

6.04    <u>Claim of Acura Financial Services</u>:  The balance due to this creditor is $7,108.24, and is secured by a lien on the vehicle.

6.05    <u>Access Unsecured Claim</u>: The Access Unsecured Claims arises from the April 9, 2009 Note and is in the approximate amount of $472,621.

6.06    <u>Other Unsecured Claims</u>:  Remaining Unsecured Claims total $1,169,981, including the $677,033 claim of GMAC and $431,000 owed to BB&T.

6.07    <u>Objection to Claims</u>:  As noted above, in connection with the FMI refinancing(s) of the Poland Road Property, the Debtors received a total of $728,650. Proofs of claim filed by the multiple note holders total $2,877,430.  Although Debtors believe they have a defense with regard to amounts above those actually received, they recognize that each of these lenders advanced funds to and were defrauded by FMI. Accordingly, for purposes of this Plan, Debtors do not intend to object to these Claims.

## ARTICLE VII
## <u>MISCELLANEOUS INFORMATION</u>

7.01    <u>Operating Reports.</u>  Debtors have filed monthly operating reports which show income from operations of D&V, Inc..  A copy of the most recent monthly report is attached as Exhibit 2.  Prior reports are available from the Bankruptcy Court.

7.02    <u>Insider Claims.</u>  There are no Insider Claims.

7.03    <u>Schedules and Disputed Claims.</u>  The Schedules of Assets and Liabilities and Statement of Financial Affairs have been filed in this Case.  Copies are available from the Bankruptcy Court.  Debtors do not anticipate that there will be any additional objections to Claims filed.

7.05    <u>Future of Debtors.</u>  Debtors are individuals, who intend to continue their business operations during the term of the Plan.

## ARTICLE VIII
## SUMMARY OF PLAN

8.01    Unclassified Claims:  Administrative Expense Claims are not classified and will be paid in full on the earlier of the Effective Date and 30 days following approval/allowance of  the Claim.

8.02    Classes of Claims:   For purposes of the Plan, pre-petition Claims are classified as follows:

8.02(a)        *Class 1* shall consist of the Secured Claim of Access.

8.02(b)        *Class 2* shall consist of the Secured Claim of Acura Financial Services.

8.02(c)        *Class 3* shall consist of the Claims of General Unsecured Creditors

8.02(d)        *Class 4* shall consist of the Unsecured Claim of Access.

## ARTICLE IX

## TREATMENT OF CLASSES OF CLAIMS

9.01    *Class 1—Access* will retain its lien on the Poland Road Property and will be paid by D&V and DVP  pursuant to the terms of the June 5, 2006 Note.  On or prior to April 1, 2015 (the *"Maturity Date"*), Borrowers will refinance this loan and will pay this Claim in full.

9.02    *Class 2—Secured Claim of Acura Financial Services ("Acura")*.  Acura will retain its lien and will be paid by Debtors' daughter, pursuant to the terms of its loan agreement.

9.03    *Class 3 —All General Unsecured Claims.*  Debtors will pay to the Class 3 Creditors their monthly Projected Disposable Income.  These funds will be held by counsel for  the Debtors and will be distributed on a pro-rata basis each quarter, commencing 90 days after the Effective Date.

9.04    *Class 4—Unsecured Claim of Access.*  Access will be paid will be paid by D&V pursuant to the terms of the April 9, 2009 Note.  On or prior to April 1, 2015 (the *"Maturity Date"*), Borrowers will refinance this loan and will pay this Claim in full.

9.05    Access Notes.  The Access Notes, which are the Class 1 and Class 4 Claims, mature on April 1, 2015 (the *"Maturity Date"*), at which time the full amount of

the Notes, anticipated to be $3,200,000 (June 5, 2006 Note) and $440,000 (April 9, 2009 Note), become due.  Although Borrowers will seek a refinancing with Access, Access is under no obligation to refinance either Note.  In the event Access declines to refinance, Borrowers will seek alternative financing and will grant a first deed of trust on the Poland Road Property and the Commercial Property as collateral for an new refinancing, whether with Access or another lender.  Alternatively, or if otherwise necessary, Debtors will sell the Poland Road Property to pay down the Access Secured Claim.

9.06    <u>Acceleration of Payments</u>:    Debtors reserve the right to accelerate payments under this Plan.

9.07    <u>Classes Entitled to Vote</u>.  Creditors in all Classes are Impaired and are thus entitled to vote to accept or reject the Plan.

9.08    <u>Unclassified Claims.</u>    Unclassified Claims consist of Administrative Claims.  Holders of unclassified Claims will be paid in full on the later of the Initial Distribution Date or within 30 days of Allowance of their Claim (or such later date upon which the holder of the Allowed Administrative Claim may agree to).

## ARTICLE X
## EXECUTION AND IMPLEMENTION OF THE PLAN

10.01    <u>Source of Funding.</u>  Except as set forth in section 9.05, funding for the Plan will come from amounts paid to the Debtors as salary and/or shareholder distributions from D&V, Inc., and if necessary, the sale of the Poland Road Property.

10.02    <u>Default</u>.  The following shall be events of default:

(a)    Failure to make the payments set forth herein.

(b)    Failure to comply with any other provision of this Plan.

In the event of a default, Creditors shall have all rights available to them under State and contract law.

10.03    <u>Executory Contracts.</u>    The Debtors are not party to any Executory Contracts.

10.04    <u>Objection to Claims.</u>  Objections to Claims shall be filed within sixty (60) days of the Effective Date.

10.05    <u>Further Documents and Actions.</u>  The Debtors are authorized to execute and file such agreements and other documents, and take or cause to be taken such action, as may be necessary or appropriate to effect and further evidence the terms and conditions of the Plan.

10.06   Additional Requirements of the United States Trustee.  As required by the Bankruptcy Code and other applicable law, the Debtors shall (i) make all payments of Quarterly Fees, and (ii) file quarterly operating reports through the closing of the Case.

10.07   Post-confirmation Management.  The Debtors will manage all other aspects of their business affairs.

10.08   Manner of Payment Under the Plan.  Any distribution made under the Plan shall be made by check.

10.09   Time Bar to Cash Distribution Checks.  Checks issued on account of an Allowed Claim shall be null and void if not negotiated within one hundred and twenty (120) days of issuance.  Requests for re-issuance of any check shall be made to C&S. **Any claim with respect to a voided check must be made on or before six (6) months of issuance.  After such date, all Claims shall be deemed discharged and the entitlement to a distribution shall be barred.**  Funds from the voided check will be re-distributed pursuant to the terms of the Plan.

## ARTICLE XI
## EFFECT OF CONFIRMATION

11.01   Injunction.  Except as otherwise expressly provided in the Plan, the Confirmation Order shall provide, among other things, that all entities who have held, hold or may hold Claims against the Debtors are permanently enjoined on and after the Effective Date:

> a.   from commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind with respect to any such Claim against the Debtors or their assets with respect to such Claim;

> b.   from the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, or any judgment, award, decree or order against the Debtors or their assets with respect to any such Claim;

> c.   from creating, perfecting or enforcing, directly or indirectly, any encumbrance of any kind against the Debtors, or against their assets, with respect to such Claim;

> d.   from asserting, directly or indirectly, any setoff, right of subrogation or recoupment of any kind against any obligation due to the Debtors, against their assets with respect to such Claim; and

e.     from any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan relating to any Claim.

11.02   <u>Allowance of Claims.</u>   Nothing contained in the Plan shall prohibit the holder of a timely filed Claim, to which the Debtors have filed an objection, from litigating its right to seek to have such Claim declared an Allowed Claim.

11.03   <u>Binding Nature.</u>   Except as otherwise provided for in the Plan or in the Confirmation Order, upon Confirmation, the Plan shall be binding on all Creditors, regardless of whether their respective Claims are Impaired or unimpaired and regardless of whether the Creditors have accepted the Plan.

## ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding Confirmation of the Plan or the Effective Date having occurred, the Bankruptcy Court shall retain sole jurisdiction of this Case for purposes of Sections 105(a), 362, 1127 and 1146(a) of the Bankruptcy Code and for the following purposes:

a.     To enforce and interpret the Plan, to resolve any disputes arising under or in  connection with the Plan, to effectuate payments under the Plan, and to compel performance of any person in accordance with the provisions of the Plan;

b.     To determine all matters with respect to the subordination, allowance, or disallowance of Claims or any portion thereof;

c.     To determine all matters with respect to property of the Estate or the Debtors, including, but not limited to matters brought under Sections 506(c), 541, 542, 547, 548, 550, and 551 of the Bankruptcy Code;

d.     To determine any motions for assumption or rejection of Executory Contracts, to determine the amount of damages, if any, suffered by the non-debtor party to any rejected Executory Contract, and to fix the allowance of any Claim resulting from the rejection of the any Executory Contract.

e.     To determine such other matters and for such other purposes as may be provided for in the Confirmation Order or otherwise deemed appropriate to accomplish its purposes;

f.     To correct any defect, or cure any omission or to reconcile any inconsistency in the Plan or in the Confirmation Order, all as may be necessary or appropriate to carry out the intent and purpose of the Plan;

g.     To make orders as are necessary or appropriate to carry out the provisions of the Plan;

h.     To classify, allow, or disallow Claims and Interests;

i.     To liquidate or estimate damages, or to determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

j.     To determine any and all disputes among Creditors with respect to their Claim(s);

k.     To adjudicate all disputes with respect to Claims or any lien, consensual or otherwise, on any asset of the Debtors or proceeds thereof, including without limitation, any lien(s) granted in connection with the refinance of the Access Notes as more particularly described in section 9.05;

l.     To hear and determine any and all motions, applications, adversary proceedings, or other matters arising out of or relating to the Plan or the Case, including without limitation matters relating to the post-petition sale of the Property;

m.     To hear and determine matters covering state, local, and federal taxes pursuant to Sections 346, 505, 525 and 1146;

p.     To determine the final amounts allowable as compensation or reimbursement of expenses pursuant to Section 503(b) and 506(b);

q.     To allow fees and reimbursement of the expenses incurred prior to the Confirmation Date by professional persons employed during this Case or any other person or entity applying for compensation;

r.     To enter and implement such orders as may be appropriate in the event the Order of Confirmation is for any reason modified, reversed, revoked or vacated.

s.     To confirm the Plan as modified pursuant to Section 1127(b) or to remedy any defect or omission or reconcile any inconsistency in the Confirmation Order; or

t.     To enter a Final Order closing the Case.

## ARTICLE XIII
## CONSIDERATIONS IN ACCEPTING THE PLAN

13.01   Impairment.  A Class of Creditors is considered to be "Impaired" where its legal, equitable or contractual rights are being modified by the Plan.  Where a Class is unimpaired, it is deemed to have accepted the Plan and is not entitled to vote.  All Classes of Creditors to be paid under the Plan are Impaired, and are entitled to vote.

13.02   Acceptance.  Except as set forth in 13.04 below, a plan must be accepted by all Impaired Classes in order to be confirmed.  A Class has accepted the plan if the plan is accepted by voting creditors who hold at least two thirds in amount and more than one half in number of the Allowed Claims in that Class.  In computing acceptance, the votes of insiders are not counted.

13.03   Other Requirements for Confirmation.  If all classes have accepted the plan, the Court must still determine whether the plan complies with the requirements set forth in Section 1129 of the Bankruptcy Code.  In general terms, and as it applies to this Plan, these requirements are as follows:  (i) the Plan complies with all of the requirements of the Bankruptcy Code and of applicable non-bankruptcy law; (ii) the Plan has been proposed in good faith; (iii) the Plan proponent has disclosed the identity and affiliation of the post-confirmation management; (iv) the Plan is in the best interests of the Creditors; and (v) the Plan is feasible.  In considering whether a plan is in the best interests of creditors, the court looks at whether the plan provides creditors with at least as much as they would receive if the Debtors were liquidated in a Chapter 7 and the assets distributed to creditors.  In determining feasibility, the court looks at whether the obligations under the plan can be performed.

13.04   Confirmation over the Rejection by a Class or Classes of Creditors.  A vote rejecting the Plan by an Impaired class of Claims does not necessarily make confirmation of the Plan impossible, so long as the Plan does not discriminate unfairly, and is fair and equitable with respect to the dissenting class.  In addition, each Creditor in the dissenting class must receive or retain under the Plan, on account of its Allowed Claim, property of a value equal to or greater than what the Creditor would receive or retain if the Debtors was liquidated under Chapter 7 of the Bankruptcy Code.

Pursuant to 11 U.S.C. section 1129(a)(15), in a case where the debtor is an individual and in which the holders of an allowed unsecured claim object to confirmation of the plan, the court will nonetheless confirm the plan providing that the value of the property being distributed under the plan is not less than the projected disposable income of the debtor(s) to be received during the five (5) year period beginning the day that the first payment is due under the plan.  This plan provides that unsecured creditors will be paid Debtors' Projected Disposable Income during the five year term of the Plan.

## ARTICLE XIV
## RISK FACTORS

This Plan, like most plans, involves risks, the most significant being that the D&V revenues will decline and Debtors will not be able to make the payments required under the Plan.


## ARTICLE XV
## TAX CONSEQUENCES

Confirmation of the Plan may modify, or affect the timing of the federal income tax treatment of Claims. In addition, state tax consequences may flow from the Plan, depending on the state of residence of the Creditor. Differences among Creditors, including differences in form of organization, methods of accounting, prior tax related actions taken with respect to the Claims, may have a material effect on tax treatment of the Plan.

CREDITORS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE TAX CONSEQUENCES OF THE PLAN IN THEIR PARTICULAR CIRCUMSTANCES.

## ARTICLE XVI
## LIQUIDATION ANALYSIS

Section 1129(a)(7(A) of the Bankruptcy Code requires that holders of Claims that are Impaired under the Plan who do not vote for the Plan must receive property under the Plan worth, as of the Effective Date, at least as much as the amount they would receive if the Debtors liquidated in a chapter 7 bankruptcy. Debtors believe that the distribution under the Plan is preferable to the distribution creditors would receive if the Debtors' estate was liquidated under chapter 7.

In a hypothetical Chapter 7, the chapter 7 Trustee is charged with expeditiously reducing all Assets of the Debtors to Cash and distributing the cash to creditors. A liquidation analysis is attached as Exhibit 3. Debtors believe the Plan provides Creditors with a greater distribution than they would receive than if the case were converted to chapter 7.

## CONCLUSION

For these reasons, the Debtors believes that this Plan and payments proposed thereunder are in the best interest of their Estate and all Creditors holding Allowed Claims.


GANESS AND VENA MAHARAJ
By Counsel:

*/s/ Ann E. Schmitt*
Ann E. Schmitt, VSB # 22030
Culbert & Schmitt, PLLC
30C Catoctin Circle, SE
Leesburg, Virginia 20175
(703) 737-6377
aschmitt@culbert-schmitt.com