UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                                )
                                      )
    GANESS MAHARAJ                     )        Case No. 09-15777-SSM
    VENA MAHARAJ                       )        Chapter 11
                                      )
                    Debtors            )

## MEMORANDUM OPINION

Ganess and Vena Maharj, who operate an auto body business, seek confirmation of a

chapter 11 plan.  Confirmation is opposed by a nominally secured creditor, DB Structured

Products, whose subordinate deed of trust against the debtors' residence would be stripped off.

Additionally, the plan has not been accepted by the class of general unsecured creditors, who

will receive an estimated 1.7 cents on the dollar over a period of five years.  Since the debtors

are retaining ownership of their business as well as certain other assets, the question is squarely

raised as to whether the absolute priority rule continues to apply in a chapter 11 case of an

individual debtor following the amendments made by the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 ("BAPCPA").  The United States Trustee supports the

debtors' position that the absolute priority rule does not apply.  A hearing was held on March 17,

2011, at which the court received evidence and heard the contentions of the parties.  For the

reasons stated, the court determines that the absolute priority rule continues to apply and

precludes confirmation of the debtors' plan.

1

<u>Background</u>

Ganess ("Dave") Maharaj and Vena Maharaj ("the debtors") are husband and wife. He is an autobody technician, and she is a receptionist. Since 1988, the debtors have operated an auto body business called D&V, Inc., also known as D&V Autobody ("D&V"). From 1988 through 2007, the debtors operated D&V at their residence located at 25872 Poland Road, Chantilly, Virginia ("Poland Road Property").

In December, 2004, they entered into a contract with Centex Homes to sell the Poland Road Property for $2,100,000. They then purchased a new home located at 15711 Hunton Lane, Haymarket, Virginia (the "Haymarket Property") for $1,500,000. Seeking to expand their autobody business, the debtors established D&V Properties, LLC ("DVP") to acquire real property located at 23550 Overland Drive, Dulles, Virginia (the "Commercial Property"), from which they would operate D&V.

<u>A. Financing and Construction of the Commercial Property</u>

On June 5, 2006, the debtors and DVP executed a $4,345,000 note with Access National Bank ("Access") to acquire the Commercial Property and expand their autobody business. The note was secured by the Poland Road Property and the Commercial Property. The note required a paydown of $1,000,000 from the proceeds of the sale of the Poland Road Property to Centex.

Unfortunately, in July 2006, the contract between Centex and the debtors fell through, and the debtors were left without the $1,000,000 needed to fulfill their obligation to Access. In February or March of 2007, the debtors contacted Vijay Taneja about the possibility of obtaining the necessary construction funding in the form of a private loan from Financial Mortgage, Inc. ("FMI"). Instead of entering into an agreement for a construction loan, however, at Mr. Taneja's

2

insistence, the debtors executed a residential loan agreement that refinanced their Poland Road Property.  On March 17, 2007, the debtors executed what they thought were two deed of trust notes payable to FMI, one in the amount of $613,600, and the other in the amount of $115,050.  These funds were used to begin construction of the new D&V facility on the Commercial Property.

Unbeknownst to the debtors, however, Mr. Taneja and FMI were involved in a fraudulent scheme whereby Mr. Taneja induced borrowers to sign multiple promissory notes with each loan closing.  These "original" notes were then sold to various secondary market purchasers, each of which believed it had the sole original note, secured by a first deed of trust.  Consistent with this scheme, the debtors were tricked into executing on March 17, 2007, three identical notes in the amount of $613,600, and two identical notes in the amount of $115,050.

Following the March 2007 refinancing of the Poland Road Property, the debtors received written notification from FMI that the notes had been sold to Wells Fargo.  Wells Fargo sent the debtors monthly billing statements, which they paid.  In May, 2007, however, the debtors received mortgage statements from two other lenders.  Mr. Taneja told the debtors that these statements were sent in error, and that they were to make payments only to Wells Fargo.  In actuality, Mr. Taneja had sold the duplicate notes to other secondary market purchasers.

On May 9, 2007, the debtors executed a $2,300,000 credit line deed of trust note and loan agreement with FMI, also secured by a deed of trust on the Poland Road Property.  Over the next nine months, FMI advanced approximately $1,400,000 pursuant to this credit line, all of which was used to fund construction of the new D&V facility.

On August 31, 2007, Kamran M. Khan, acting on behalf of FMI, asked the debtors to sign some additional papers that were allegedly overlooked at the prior closings.  In actuality, the papers consisted of a new $613,000 note and deed of trust.  It is unclear whether this note was ever sold, as no lender has ever made demand under the note; however, a deed of trust dated August 31, 2007, remains of record in Loudoun County.

On November 23, 2007, Taneja told debtor Vena Maharaj that she needed to sign additional papers in connection with a requested draw under the Construction Loan.  Debtor Vena Maharaj signed the papers, only to find that they, too, supported a promissory note in the amount of $615,000.

By the Spring of 2008, FMI's fraudulent activity was discovered and, in a suit initiated by Wells Fargo, FMI's bank accounts were frozen.  Shortly thereafter, FMI and Taneja sought relief under chapter 11 the Bankruptcy Code.  The debtors began receiving mortgage billing statements from various lenders, including Wells Fargo, GMAC, MidFirst, and EMC Mortgage, all claiming to hold notes secured by the Poland Road Property.  Faced with multiple demands for payment and threats of foreclosure, the debtors filed a declaratory judgment complaint in the FMI bankruptcy, Adversary Proceeding No. 08-1344-SSM, and sought a determination as to which lenders held enforceable notes and deeds of trust on the Poland Road Property ("FMI Litigation").  Discovery in the FMI Litigation established that monthly statements from GMAC, MidFirst, and EMC Mortgage had been addressed to the debtors at FMI's business address, and that FMI made payments on these notes from the account of NRM Investments, Inc., an affiliate of FMI.

As part of the FMI Litigation, the debtors reached a settlement with the FMI trustee, H. Jason Gold, regarding amounts due under the Construction Loan.  Funded by Access under an April 9, 2009 note, the debtors paid the FMI bankruptcy estate in full satisfaction of the $1,400,000 owed under the Construction Loan.  DVP was the borrower under this note, which was guaranteed by the debtors and D&V.

## B.  The Haymarket Property

When Centex notified the debtors that it would not close on the purchase of the Poland Road Property, the debtors attempted to sell the Haymarket Property.  The property was offered for sale just as the real estate market was beginning its steep decline.  The debtors made mortgage payments for some time, but ultimately were unable to carry the cost of this property and the amounts due to Access.  They defaulted on the mortgage debt due to Branch Banking & Trust Company ("BB&T"), and in December 2008, BB&T foreclosed on the property.

## C.  The Debtors' Chapter 11 Filing and Plan of Reorganization

On July 21, 2009, the debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and have continued to operate the auto body business as debtors in possession. The FMI Litigation was dismissed by the consent of all parties on the understanding that the various obligations would be addressed in the debtors' chapter 11 case.  DB Structured Products filed a timely proof of claim in the amount of $682,086 asserting that it was secured by a deed of trust against the Poland Road property.  On August 16, 2010, the debtors filed an adversary proceeding against DB Structured Products and five other deed of trust holders to "strip off" their deeds of trusts against the Poland Road property, which the complaint asserted was worth $497,700, on the ground that their liens were all subordinate to the first-lien deed of trust in

5

favor of Access National Bank, on which $3,540,498 was owed.  Complaint, *Maharaj v. Wells Fargo Bank, N.A., et al. (In re Maharaj),* A.P. No. 10-01322-SSM.  Among the allegations in the complaint was that "Debtors intend to file a plan of reorganization which treats the Defendants' claims as unsecured debts and strips those liens from the property."  *Id.* at ¶ 33.  DB Structured Products filed an answer which did not specifically admit or deny the factual allegations of the complaint, but asserted the validity of its lien and "objected" to any strip-off.  Response to Debtors' Complaint,  *Maharaj v. Wells Fargo Bank, N.A., et al. (In re Maharaj),* A.P. No. 10-01322-SSM.

On December 15, 2010, the debtors filed the plan that is presently before the court.  The final pretrial conference in the adversary proceeding was continued, with the consent of all parties, including DB Structured Products, based on the representation that "Debtors have filed a chapter 11 plan of reorganization, which classifies the Defendants' claims as unsecured, in essence effectuating the same relief sought in the Adversary Proceeding. . . . [and] [c]onfirmation of the plan may render the Adversary Proceeding . . . stay moot."  Joint Motion to Continue Final Pre-Trial Hearing at ¶ 3-4,  *Maharaj v. Wells Fargo Bank, N.A., et al. (In re Maharaj),* A.P. No. 10-01322-SSM.

In addition to providing for a single class of administrative expense claims, the plan divides creditors into two classes of secured claims and two classes of unsecured claims.  A summary of the classes and their treatment is as follows:

| Class | Description | Treatment |
|-------|-------------|-----------|
| I | Claim of Access Bank secured by Debtors' residence located at 25872 Poland Road, Chantilly, Virginia | Debtors will refinance the June 5, 2006 Note on or prior to the maturity date, and the Note will be paid in full. |

6

| II | Claim of Acura Financial Services secured by a 2007 Acura TSX Sedan | Acura will retain its lien, to be paid by the Debtors' daughter pursuant to the terms of the loan agreement. |
| III | All General Unsecured Claims (This class includes the claims by DB, Nationstar, Wells Fargo, and Wells Fargo Trustee. The claims of these four creditors are wholly unsecured by the Poland Road Property.) | To be paid from the Debtors' monthly Projected Disposable Income for 60 months, which will be distributed on a pro-rata basis each quarter commencing 90 days after the Effective Date.[1] |
| IV | Unsecured Claim of Access Bank | Debtors will refinance the April 9, 2009, Note on or prior to the maturity date, and the Note will be paid in full. |

Classes I and IV, representing claims totaling $3,930,000, accepted the plan. Discover Bank—holding a general unsecured claim in the amount of $10,847.49—was the only creditor in Class III to return a ballot, and voted to reject the plan. Acura Financial Services failed to return a ballot.

A summary of the debtors' assets is shown below:

| Property | Description | Estimated Value |
| --- | --- | --- |
| Poland Road Property | 25872 Poland Road, Chantilly, Virginia | $450,000 |
| D&V Properties, LLC | The sole asset is the Commercial Property, located at 23550 Overland Drive, Dulles, Virginia | $2,500,000 |
| D&V, Inc. | Cash flow from the operation of the business | Fluctuates from month to month |

---

[1] The plan specifies Projected Disposable Income to be $1,000 per month or such other amount as the court may determine.

7

| Vehicles | 1982 Ford Pickup (of negligible value), 2001 Lexis IS 300 ($7,500), 1999 BMW M-3 ($14,300), 2007 Acura TSX Sedan ($18,000) | $39,800 |
| Other Personal Property | Jewelry ($20,000), life insurance policies ($2,700), NY Life annuity ($26,371) | $49,071 |

The cash flow obtained from D&V Inc. varies from month to month. For the most recent nine-month period ending September 30, 2010, D&V, Inc. showed an overall net loss of $297.04. Nevertheless, the debtors assert that the tax assessed value of the Commercial Property will soon be reduced, at which point the debtors expect a decrease in their annual tax liability and a corresponding additional $1,000 per month from the operation of D&V, Inc. It is this additional projected income that will be used to pay the general unsecured claims (Class III).

<u>Discussion</u>

The requirements for confirmation of a chapter 11 plan are set forth in § 1129, Bankruptcy Code. The most important of these are that the plan complies with the applicable provisions of the Bankruptcy Code; that the plan is proposed in good faith; that nonaccepting creditors receive payments having a present value at least equal to what they would receive in a chapter 7 liquidation ("the liquidation test"); and that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor (unless such liquidation or reorganization is proposed in the plan) ("the feasibility test"). § 1129(a)(1), (3), (7), (11), Bankruptcy Code. If a creditor objects to confirmation, an individual debtor's plan must additionally provide for distribution to creditors that is not less than the debtor's projected disposable income to be received during the 5-year period beginning on the date that the first

8

payment is due under the plan, unless claims can be paid in full in a shorter time ("the disposable

income test").  § 1129(a)(15), Bankruptcy Code.  With respect to the debtors' plan, the only

issues in dispute are (1) whether the plan may "strip off" the lien of DB Structured Products; and

(2) whether the debtors have satisfied the requirement for "cram down" confirmation over the

rejection of the plan by the class of unsecured creditors, and, specifically, whether the "absolute

priority rule" applies in this case.

### A.  The "Strip off" of the Subordinate Mortgage Liens

In its objection, DB Structured Products states, without elaboration and without citation

of any legal authority:

> [T]he defendant [*sic*] objects to the debtors' Chapter 11 Plan as it designates the
> secured creditor as a Class III unsecured claim and specifically provides that the
> lien (deed of trust) which secures this claim shall be released upon confirmation
> of the Chapter 11 Plan of Reorganization. A determination of the validity of the
> lien has not been established in this Bankruptcy case.

Objection at ¶ 4, *In re Maharaj*, No. 09-15777-SSM.  There is no question that outside of

bankruptcy, a creditor secured by a lien, such as a deed of trust against real property, may retain

its lien until its claim is paid in full.  In bankruptcy, however, a claim is treated as secured only

to the extent of the value of the collateral and is otherwise treated as unsecured.  § 506(a),

Bankruptcy Code.  Additionally, a lien securing a claim that is not an allowed unsecured claim is

void.  § 506(d), Bankruptcy Code.  To be sure, chapter 11, like chapter 13, contains a specific

prohibition against the modification of a claim secured only by the debtor's principal residence.

§ 1123(b)(5), Bankruptcy Code.  In the chapter 13 context, however, this limitation has been

held not to apply to a claim that is not secured by <u>any</u> equity in the property because the amount

due on prior liens exceeds the value of the property.  *See, e.g.*, *Wright v. Commercial Credit*

*Corp. (In re Wright)*, 178 B.R. 703, 707 (E.D. Va. 1995), *appeal dismissed*, 77 F.3d 472 (4th Cir.

1996); *In re Dean*, 319 B.R. 474, 476 (Bankr. E.D. Va. 2004); *In re Pond*, 252 F.3d 122, 126-27

(2d Cir. 2001); *Tanner v. FirstPlus Fin., Inc.*, 217 F.3d 1357, 1360 (11th Cir. 2000); *Johnson v.

Asset Mgt. Group, LLC*, 226 B.R. 364, 369 (D. Md. 1998); *First Mariner Bank v. Johnson*, 411

B.R. 221, 225 (D. Md. 2009), *aff'd*, 2011 WL 52358, 2011 U.S. App. LEXIS 402  (4th Cir. Jan.

6, 2011).  Given that chapter 11's restriction on modification of residential mortgages is identical

to that of chapter 13, the court can see no reason—and DB Structured Products has certainly

suggested none—why the same result would not apply in chapter 11.  DB Structured Products

does not take issue with the validity, seniority, or amount of the Access National Bank lien

against the property, nor has it disputed the debtors' valuation of the property.  Since there is

clearly no equity to which DB Structured Products' lien can attach, there is no substantive bar to

the voidance of DB Structured Products' subordinate deed of trust.  There is, of course a

procedural issue, namely whether voidance of a deed of trust on the ground that there is no

equity to which it can attach can be accomplished by plan confirmation or requires a separate

adversary proceeding or contested matter brought for that purpose.  While the Fourth Circuit has

held that a separate proceeding would always be required in a chapter 13 case, *see Cen-Pen

Corp. v. Hanson,* 58 F.3d 89 (4th Cir. 1995) and *Piedmont Trust Bank v. Linkous (In re Linkous)*,

990 F.2d 160 (4th Cir. 1993), it has allowed extinguishment of a lien by plan confirmation in the

chapter 11 context.  *Universal Suppliers, Inc. v. Reg'l Bldg. Sys., Inc. (In re Regional Bldg.

Systems, Inc.)*, 254 F.3d 528 (4th Cir. 2001) (asserted lien of creditor whose claim was treated as

unsecured by chapter 11 plan was extinguished by plan confirmation, distinguishing *Cen-Pen*).

Certainly, there can be no issue of lack of notice or failure to accord due process, since an

10

adversary proceeding was in fact brought, the deed of trust holders were properly served and

have appeared generally, and in consenting to a continuance of the final pretrial conference, they

all acknowledged that the plan provided for the same relief the debtors were seeking in the

adversary proceeding.  Accordingly, the court determines that the objection (whether viewed as

substantive or procedural) of DB Structured Products is not well taken and must be overruled.

### B.  The Applicability of the Absolute Priority Rule

There remains, however, the issue of whether the debtors may obtain confirmation of the

plan under the "cram-down" provisions of § 1129(b), Bankruptcy Code.  Confirmation of a

chapter 11 plan normally requires that all impaired classes accept the plan by the requisite

majority, which is two-thirds in dollar amount and more than one-half in number of the creditors

actually voting in each class.  §§ 1129(a)(8), 1126(c), Bankruptcy Code.  The debtors' plan,

however, has not been accepted by Class III, which consists of unsecured creditors other than the

separately-classified claim of Access National Bank.  The court may nevertheless confirm a plan

over the rejection of an impaired class—a procedure commonly, if inelegantly, referred to as

"cram down"—provided the other requirements for confirmation have been met (including the

requirement of § 1129(a)(10) that at least one impaired class has accepted the plan) if "the plan

does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or

interests that is impaired under, and has not accepted, the plan."  § 1129(b)(1), Bankruptcy Code.

To be considered "fair and equitable" to a dissenting class of unsecured claims, a plan must, at a

minimum,[2] provide that "the holder of any claim or interest that is junior to the claims of such

---

[2]  As the Fourth Circuit has explained, "[a] plan must be fair and equitable in a broad
sense, as well as in the particular manner specified in 11 U.S.C. Sec. 1129(b)(2)."  *Travelers Ins.
Co. v. Bryson Assocs. XVIII (In re Bryson Assocs. XVIII)*, 961 F.2d 496, 505 (4th Cir. 1992).  In

class will not receive or retain under the plan on account of such junior claim or interest any property, *except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.*"  § 1129(b)(2)(B)(ii), Bankruptcy Code (emphasis added).  The requirement that unsecured creditors must be paid in full before equity holders may retain or receive any property is commonly referred to as the absolute priority rule.  It is the addition of the emphasized language, which was added by BAPCPA, that is at issue here.  The cross-referenced § 1115 (also added by BAPCPA) states, in pertinent part:

> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541 -
>
> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
>
> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

Courts analyzing these provisions disagree as to whether they "have the effect of eliminating the absolute priority rule completely from individual chapter 11 case confirmation decisions or only as to post-petition earnings and other property acquired by individual chapter 11 debtors after the commencement of the case."  *In re Mullins*, 435 B.R. 352, 359 (Bankr. W.D. Va. 2010).  Here, the debtors contend that these amendments eliminate the absolute priority rule for individual chapter 11 debtors, and therefore render their plan confirmable.  The argument is

---

the present case, however, no party has suggested, and the evidence does not suggest, that broader considerations would make the treatment of Class 3 inequitable if the absolute priority test were satisfied or did not apply.

12

straight-forward, if somewhat subtle.  They read § 1115, with its internal reference to § 541, not

merely as expanding upon what constitutes property of the estate for an individual debtor, but as

defining it.  Section 541 specifies property of the estate as including "all legal or equitable

interests of the debtor in property as of the commencement of the case."  Thus, the argument

goes, § 1115 embraces *all* property interests of the debtor, whether acquired before or after the

chapter 11 filing, and since § 1129(b)(2)(B)(ii) allows a debtor to keep the property "included in

the estate" by § 1115, an individual debtor may retain all of his or her property, subject only to

the liquidation test and the disposable income test.

A significant number of courts have adopted the interpretation urged by the debtors.  *See,*

*e.g.*, *In re Roedemeier*, 374 B.R. 264 (Bankr. D. Kan. 2007); *In re Tegeder*, 369 B.R. 477

(Bankr. D. Neb. 2007); *In re Bullard*, 358 B.R. 541 (Bankr. D. Conn. 2007); *In re Johnson*, 402

B.R. 851, 852-53 (Bankr. N.D. Ind. 2009) ("An individual debtor's plan does not need to satisfy

the absolute priority rule . . . and, even though unsecured creditors will not be paid in full, can be

confirmed over their objection so long as the plan satisfies the disposable income test . . . ."); *In*

*re Shat*, 424 B.R. 854, 865 (Bankr. D. Nev. 2010) (holding "the phrase 'in addition to the

property specified in section 541' to mean that Section 1115 absorbs and then supersedes Section

541 for individual chapter 11 cases.  This construction, in turn, leads to the position that Section

1129(b)(2)(B)(ii)'s exception extends to all property of the estate . . . .").  These courts contend

that allowing an individual to retain *all* property of the estate is what allows individual debtors to

fully function in Chapter 11, as they might otherwise do in Chapter 13 (which has no equivalent

of the absolute priority rule) were it not for the debt limits for chapter 13 relief.[3]  *Roedemeier*,

374 B.R. at 275-76.

Other courts, however, have chosen to read § 1129(b)(2)(B)(ii) as referring only to the

additional property brought into the estate by § 1115, not property that would already be

property of the estate under § 541.  *See*, *e.g.*, *In re Mullins,* 435 B.R. 352 (Bankr. W.D. Va.

2010); *In re Gelin*, 437 B.R. 435 (Bankr. M.D. Fla. 2010); *In re Gbadebo*, 431 B.R. 222 (Bankr.

N.D. Calif. 2010); *In re Karlovich,* — B.R. —, 2010 WL 5418872, 2010 Bankr. LEXIS 4014

(Bankr. S.D. Cal. Nov. 16, 2010); *In re Walsh*, —  B.R. —, 2011 WL 867046, 2011 Bankr.

LEXIS 780 (Bankr. D. Mass. Mar. 8, 2011); *In re Stephens*, — B.R. —, 2011 WL 719485, 2011

Bankr. LEXIS 593 (Bankr. S.D. Tex. Feb. 22, 2011).  Thus, these courts hold that BAPCPA did

not abolish the absolute priority rule for individual debtors, but merely allowed a debtor to keep

post-petition earnings and other property acquired after the commencement of the case.  *Mullins,*

435 B.R. at 361.

So many able jurists have written so extensively on this issue that little purpose would be

served by yet another analysis of the competing arguments.  In one respect, much depends on

whether one views the BAPCPA amendments with respect to individual chapter 11 cases as

evidencing a desire on the part of Congress to assimilate individual chapter 11 cases to chapter

13 cases or instead to prevent debtors from making an end-run around BAPCPA's amendments

to chapter 13 by the simple expedient of filing under chapter 11 instead.  If the intent was solely

to make chapter 11 for individuals like chapter 13, elimination of the absolute priority rule would

---

[3]  Chapter 13 is available only to individuals that owe unsecured debts of less than
$360,475 and secured debts of less than $1,081,400.  § 109(e), Bankruptcy Code.

be consistent with that purpose, since chapter 13 has no such rule, relying instead on the

liquidation test and the disposable income test to ensure that debtors pay creditors to the best of

their ability.  As Judge Stone observed in *Mullins*, however, that purpose would have been more

straight-forwardly expressed by simply stating, "'except that in a case in which the debtor is an

individual, this provision shall not apply,'" rather than by awkwardly referring to § 1115.

*Mullins*, 435 B.R. at 360-61.  And as Judge Bowie observed in *Karlovich*, courts that view "the

BAPCPA amendments as an abrogation of the absolute priority rule in individual Chapter 11

cases . . . because they thought Congress was intending to make individual Chapter 11 cases

more like Chapter 13 cases" overlook the fact that "if that were Congress' intent, Congress

would simply have amended the statutory debt ceilings for Chapter 13 cases set out in 11 U.S.C.

§ 109(e), and either eliminate them altogether or set them much higher." *Karlovich*, 2010 WL

5418872 at *4; 2010 Bankr. LEXIS 4014, at *11.  Certainly, the analysis either way is not free

from doubt.  But upon careful consideration, this court finds the interpretation placed on

§1129(b)(2)(B)(ii) by *Mullins* and the other opinions reaching the same conclusion to be more

consistent with the structure of the changes made by BAPCPA.  Accordingly, the court

concludes that the absolute priority rule continues to exist in individual chapter 11 cases with

respect to non-exempt property that was owned by the debtor on the filing date of the petition.[4]

---

[4] Prior to BAPCPA, there was a division of opinion as to whether an individual debtor's
retention of exempt property violated the absolute priority rule.  *Compare In re Gosman*, 282
B.R. 45 (Bankr. S.D. Fla. 2002) (holding that absolute priority rule was not satisfied even if the
property retained was exempt), *with In re Egan*, 142 B.R. 730, 733 (Bankr. E.D. Pa. 1992) ("[I]f
debtors intend to retain only *exempt* property, then they are merely retaining that which is their
absolute right to retain in any event, and they are not, properly speaking, receiving or retaining
'any interest that is junior to the interests' of any class of creditors").  Because the debtors here
are retaining property in excess of what they have claimed exempt, the court need not reach that
issue.  The *Egan* analysis, however, does seem more consistent with § 1123(c), Bankruptcy Code,

Because the debtors' plan allows them to retain non-exempt property that they owned on the filing date of the petition while paying unsecured creditors less than 100 cents on the dollar, the requirements for "cram-down" are not satisfied, and the plan cannot be confirmed over its rejection by the class of unsecured creditors.

It is admittedly with some reluctance that the court reaches this conclusion.  The court has considerable sympathy for the position the debtors have found themselves in through no fault of their own.  To borrow a phrase from Shakespeare,[5] they have been "most notoriously abus'd" as a result of the fraud practiced on them by Taneja.  Had they more income, they could have funded a plan that would have provided unsecured creditors with a meaningful dividend, thereby increasing the likelihood that the unsecured creditors would have accepted the plan.  Here, however, the debtors' income is insufficient to permit more than a token payment on unsecured claims,[6] particularly as the claims pool is swollen by the various subordinate mortgage claims that are being rendered unsecured.  It is hardly surprising, therefore, that the unsecured creditors have not accepted the plan even though as a practical matter it provides them with more of a recovery than if the debtors had simply filed for chapter 7 relief.  But a fundamental feature of chapter 11 is the right of creditors to vote on a plan that impairs their claims, and confirmation can be achieved over their rejection of the plan only in limited circumstances.

which prohibits anyone other than the debtor from proposing a plan that provides for the use, sale, or lease of exempt property, and for that reason the court is inclined to hold that retention of exempt property does not violate the absolute priority rule.

[5] William Shakespeare, *Twelfth Night or What You Will*, Act. V, Sc. 1 (New Haven: Yale Univ. Press, 1954).

[6] Indeed, the court has some concern with the debtors' ability to make even the $1,000 per month payment proposed in the plan, but would be willing to give the debtors the benefit of the doubt if the other requirements for confirmation were satisfied.

16

Although the court believes its analysis is correct, the court recognizes that a number of able jurists have held to the contrary, and the reported opinions are more or less evenly split.[7] No court of appeals has yet ruled on the issue, which is one of considerable public importance. The number of individual chapter 11 filings appears to have risen rather dramatically in the last two years, and the continued existence or not of the absolute priority rule will dictate whether plans can actually be confirmed in many of those cases. Because the issue is clearly one of great importance and needs to be authoritatively decided, the court will, if the debtors so request, certify its ruling under 28 U.S.C. § 158(d)(2)(A)(i) for direct appeal to the United States Court of Appeals for the Fourth Circuit.

A separate order will be entered denying confirmation.


Date: _____          _____
                                      Stephen S. Mitchell
Alexandria, Virginia                  United States Bankruptcy Judge

---

[7] At the time Judge Stone authored the *Mullins* opinion, he acknowledged that his was the minority view. In the short time since *Mullins* was published, however, the reported opinions have mostly supported his holding, with the result that *Mullins* may very well now represent the majority view.

17

Copies to:

Ganess Maharaj
Vena Maharaj
25872 Poland Road
Chantilly, VA 20152
Debtors

Ann E. Schmitt, Esquire
Culbert & Schmitt, PLLC
30C Catoctin Circle SE
Leesburg, VA 20175
Counsel for the debtors

Kelly Gring, Esquire
1601 Rolling Hills Drive
Suite 125, Surry Building
Richmond, VA  23229
Counsel for DB Structured Products

Martha L. Davis, Esquire
Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA  22314