FILED

2012 JUN 14 P 3:21

**PUBLISHED**

CLERK
US BANKRUPTCY
ALEXANDRIA DIVISION

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: GANESS MAHARAJ; VENA
MAHARAJ,
                                                  *Debtors.*

GANESS MAHARAJ; VENA MAHARAJ,
                              *Plaintiffs-Appellants.*

                                                                No. 11-1747

STUBBS & PERDUE, P.A.; NATIONAL
ASSOCIATION OF CONSUMER
BANKRUPTCY ATTORNEYS,
          *Amici Supporting Appellants,*

STEVEN HARRIS GOLDBLATT,
      *Court-Assigned Amicus Counsel.*

Appeal from the United States Bankruptcy Court
for the Eastern District of Virginia, at Alexandria.
Stephen S. Mitchell, Bankruptcy Judge.
(09-15777-SSM)

Argued: March 22, 2012

Decided: June 14, 2012

Before DUNCAN, AGEE, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Duncan and Judge Diaz joined.

## COUNSEL

**ARGUED:** Daniel Mark Press, CHUNG & PRESS, PC, McLean, Virginia, for National Association of Consumer Bankruptcy Attorneys, Amicus Supporting Appellants. Ann Elizabeth Schmitt, CULBERT & SCHMITT, PLLC, Leesburg, Virginia, for Appellants. Nilam Ajit Sanghvi, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Steven Harris Goldblatt, Court-Assigned Amicus Counsel. **ON BRIEF:** Trawick H. Stubbs, Jr., Amy Marvine Currin, Rodney A. Currin, Laurie B. Biggs, William H. Kroll, Heather Kelly Pierce, Ashley Baxter Curry, John W. King, STUBBS & PERDUE, P.A., New Bern, North Carolina, for Stubbs & Perdue P.A., Amicus Supporting Appellants. Brett Weiss, CHUNG & PRESS, LLC, Greenbelt, Maryland; Tara Twomey, NATIONAL ASSOCIATION OF CONSUMER BANKRUPTCY ATTORNEYS, San Jose, California, for National Association of Consumer Bankruptcy Attorneys, Amicus Supporting Appellants. Steven H. Goldblatt, Director, Doug Keller, Supervising Attorney, Derek Young, Emily Giarelli, Jina Moon, GEORGETOWN UNIVERSITY LAW CENTER, Appellate Litigation Program, Washington, D.C., for Steven Harris Goldblatt, Court-Assigned Amicus Counsel.

## OPINION

AGEE, Circuit Judge:

In this direct appeal from the Bankruptcy Court, we address a question of first impression in the circuit courts of appeal: whether, in light of the 2005 amendments to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* ("the Code"), codified by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005), the absolute priority rule continues to apply to individual debtors

in possession proceeding under Chapter 11.[1] Because we answer that question in the affirmative, we affirm the bankruptcy court's order denying plan confirmation.

## I.

Because this appeal requires us to resolve a pure question of law that has divided the nearly two dozen bankruptcy and district courts that have faced it, we begin by setting forth that background in detail. In subpart A, we recite the history of the absolute priority rule. In subpart B, we describe the statutory provisions relevant to determining whether the BAPCPA abrogated the absolute priority rule for individual debtors proceeding under Chapter 11. In subpart C, we discuss the judicial decisions to date addressing that question.

## A.

We begin by setting forth the history of the absolute priority rule, which for reasons that will become clear, is significant for our disposition here. The absolute priority rule traces its origins to the latter half of the nineteenth century. The Supreme Court articulated the earliest version of the rule in response to widespread collusion in the context of railroad reorganizations, just after the Civil War. The Court announced that "stockholders are not entitled to any share of the capital stock nor to any dividend of the profits until all the debts of the corporation are paid." *Chi., Rock Island & Pac. R.R. v. Howard*, 74 U.S. 392, 409-10 (1868). As the Supreme Court later described, "[t]he rule had its genesis in judicial construction of the undefined requirement of the early bankruptcy statute that reorganization plans be 'fair and equitable.'" *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988); *see also* Pub. L. No. 73-296, 48 Stat. 911, 919

---

[1] A debtor proceeding under Chapter 11 is termed a debtor in possession under 11 U.S.C. § 1101, but for simplicity we use the generic term "debtor" for purposes of this opinion.

4                                    In Re: MAHARAJ

(1934) (amending the Bankruptcy Act to require a finding that
a plan is "fair and equitable and does not discriminate unfairly
in favor of any class of creditors or stockholders" for confir-
mation). In *Case v. Los Angeles Lumber Products Co.*, 308
U.S. 106, 117 (1939), the Court for the first time used the
term "absolute priority" to describe the rule.

Although based on the "fair and equitable" requirements
found in § 77B of the Bankruptcy Act ("the Act"), the abso-
lute priority rule had itself never been codified under the Act.[2]
In fact, Congress expressly prohibited its further judicial
application by passing the 1952 amendments to the Act. *See*
Pub. L. 456, 66 Stat. 420, 433 (1952). In modifying the
requirements for confirmation of a plan of reorganization
under what was then Chapter XI of the Act, Congress
amended the Act such that: "[c]onfirmation of an arrangement
shall not be refused solely because the interests of a debtor,
or if the debtor is a corporation, the interest of its stockholders
or members will be preserved under the arrangement." *Id.*
Instead, Congress provided for confirmation if the plan "is for
the best interest of the creditors and is feasible." *Id.*

The legislative history to the 1952 amendments to the Act

---

[2]Although Congress enacted federal bankruptcy laws in 1800, 1841, and
1867, the Bankruptcy Act of 1898, 30 Stat. 544, "marked the beginning
of the era of permanent federal bankruptcy legislation." Charles Jordan
Tabb, *The History of the Bankruptcy Laws in the United States*, 3 Am.
Bankr. Inst. L. Rev. 5, 23 (1995). As the Supreme Court later stated, the
purpose of the Act was to afford the emancipated debtor "[t]he new oppor-
tunity in life and the clear field for future effort." *Local Loan Co. v. Hunt*,
292 U.S. 234, 244 (1934).

Congress passed several amendments to the Act after 1898, but it under-
took a complete overhaul of the bankruptcy system with the passage of the
Bankruptcy Reform Act of 1978; Pub. L. No. 95-598, 92 Stat. 2549, 2682
(1978). *See. e.g.*, Tabb, *History of the Bankruptcy Laws, supra* at 26-33.
The Bankruptcy Reform Act replaced the (Bankruptcy) Act with the Code,
culminating "almost a decade of study and debate about bankruptcy
reform[.]" *Id.* at 32.

reflects that Congress intended an express repeal of the judi-cially created absolute priority rule in the context of Chapter XI (which was designed for small, privately held businesses).[3] "[T]he fair and equitable rule . . . cannot realistically be applied . . . . Were it so applied, no individual debtor, [and] no corporate debtor where the stock ownership is substantially identical with management could effectuate an arrangement except by payment of the claims of all creditors in full." H.R. Rep. No. 82-2320 (1952) *reprinted in* 1952 U.S.C.C.A.N. 1960, 1981.

In 1978, Congress passed the Bankruptcy Reform Act of 1978, replacing the Act with the Code and creating the struc-ture of modern bankruptcy practice. In enacting the Code, Congress merged many aspects of Chapters X and XI (as well as the infrequently-used Chapter XII) of the Act into the newly created Chapter 11. *See* H.R. Rep. No. 95-595 at 223 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6183 ("This bill adopts a consolidated chapter for all business reorganiza-tions."). In doing so, Congress specifically incorporated the absolute priority rule into § 1129(b)(2)(B)(ii).[4] *Ahlers,* 485 U.S. at 202. The absolute priority rule, as provided in § 1129, remained unchanged until the passage of BAPCPA in 2005.

---

[3] The absolute priority rule remained a fixture of Chapter X of the Act, which was designed for public companies. *See* Ralph A. Peeples, *Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule*, 63 Am. Bankr. L. J. 65, 66 (1989).

[4] The legislative history of the 1978 Act indicates that Congress per-ceived a need for the new Chapter 11 to have "the flexibility of Chapter XI . . . and . . . the essence of the public protection features [i.e. the abso-lute priority rule] of current Chapter X." H.R. Rep. No. 95-595 at 224 (1978), *reprinted in* 1978 U.S.C.C.A.N 5963, 6183. "The areas of greatest importance [in Chapter 11] are the financial standard for confirmation [later described as the absolute priority rule]; the court hearing on the plan and the report on the plan to creditors and stockholders; the right to pro-pose a plan; and the appointment of a trustee." *Id.*

## B.

Under the now-operative provisions of the Code, a bankruptcy case under Chapter 11 commences with the filing of a Chapter 11 petition in the bankruptcy court. 11 U.S.C. § 301. Commencement of the case creates the bankruptcy estate, which includes, pursuant to 11 U.S.C. § 541(a)(1), "all legal or equitable interests of the debtor in property as of the commencement of the case."

After filing a voluntary petition under Chapter 11, a debtor may file a plan of reorganization with the bankruptcy court. 11 U.S.C. § 1121(a). In addition to numerous other requirements, a reorganization plan must specify classes of claims against the debtor based on specific statutory requirements. 11 U.S.C. § 1123(a)(1). To be operative, a Chapter 11 reorganization plan must be confirmed by the bankruptcy court. A precondition of plan confirmation is that it meet the requirements set forth in 11 U.S.C. § 1129(a).

Of particular import to this case is the requirement, found at § 1129(a)(8)(A), that each impaired class of creditors accept the plan. Pursuant to § 1129(b), however, a plan of reorganization may be confirmed over the dissent of an impaired class of creditors using a procedure commonly known as a "cram down." The plan can avoid the requirements of § 1129(a)(8) in a cram down procedure "if the plan does not discriminate unfairly, and is fair and equitable" to the dissenting creditors. 11 U.S.C. § 1129(b)(1).

The Code inclusively sets forth, at § 1129(b)(2), specific requirements that must be met for a plan to be "fair and equitable." Among those requirements is the absolute priority rule, the construction of which is central to the disposition of this appeal. Prior to 2005, the absolute priority rule (as codified) was simply that, in order to be fair and equitable, a proposed Chapter 11 plan must provide: "the holder of any claim or interest that is junior to the claims of such [dissenting] class

will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). In other words, if the proposed plan allowed the debtor to retain property, any dissenting creditors must be paid in full in order for the plan to be "crammed down." *See Ahlers*, 485 U.S. at 202.

In 2005, Congress enacted BAPCPA, which we have previously described as an "attempt[ ] to reduce the spiraling costs to society of bankruptcies." *In re Ciotti*, 638 F.3d 276, 279 (4th Cir. 2011). Although Congress, in enacting BAPCPA, altered the Code in numerous respects, our focus is the amendment to § 1129(b)(2)(B)(ii), which contains the absolute priority rule. The Code, after BAPCPA, now states that to be fair and equitable, a proposed plan must provide that:

> the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, *except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.*

*Id.* (2005 amendment emphasized).

Section 1115 (which was added to the Code by BAPCPA) in turn provides:

> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541—

>> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a

case under chapter 7, 12, or 13, whichever
occurs first; and

(2) earnings from services performed by the
debtor after the commencement of the case
but before the case is closed, dismissed, or
converted to a case under chapter 7, 12, or
13, whichever occurs first.

(b) Except as provided in section 1104 or a con-
firmed plan or order confirming a plan, the debtor
shall remain in possession of all property of the
estate.

11 U.S.C. § 1115.

### C.

A significant split of authorities has developed nationally
among the bankruptcy courts regarding the effect of the BAP-
CPA amendments on the absolute priority rule when the
Chapter 11 debtor is an individual. Some courts have adopted
the "broad view" that, by including in § 1129(b)(2)(B)(ii) a
cross-reference to § 1115 (which in turn references § 541, the
provision that defines the property of a bankruptcy estate),
Congress intended to include the entirety of the bankruptcy
estate as property that the individual debtor may retain, thus
effectively abrogating the absolute priority rule in Chapter 11
for individual debtors. Other courts, adopting the "narrow
view," have held that Congress did not intend such a sweep-
ing change to Chapter 11, and that the BAPCPA amendments
merely have the effect of allowing individual Chapter 11
debtors to retain property and earnings acquired after the
commencement of the case that would otherwise be excluded
under § 541(a)(6) & (7).[5]

---

[5]We adopt the terminology frequently used by commentators and courts
writing on the post-BAPCPA status of the absolute priority rule. That is,
the "broad view" represents a finding that the absolute priority rule has
been abrogated by BAPCPA, while the "narrow view" holds no abrogation
has occurred.

To date, one district court, one bankruptcy appellate panel, and five bankruptcy courts have taken the "broad view" and ruled, although on different grounds, that Congress intended abrogation of the absolute priority rule. *See In re Friedman*, 466 B.R. 471 (9th Cir. BAP 2012); *SPCP Group, LLC v. Biggins*, 465 B.R. 316 (M.D. Fla. 2011); *In re Shat*, 424 B.R. 854 (Bankr. D. Nev. 2010); *In re Johnson*, 402 B.R. 851 (Bankr. N.D. Ind. 2009); *In re Tegeder*, 369 B.R. 477 (Bankr. D. Neb. 2007); *In re Roedemeier*, 374 B.R. 264 (Bankr. D. Kan. 2007); *In re Bullard*, 358 B.R. 541 (Bankr. D. Conn. 2007).

Some of these "broad view" courts have ruled Congress intended abrogation on the basis of the "plain" language of § 1129(b)(2)(B)(ii). In *Biggins*, for example, the district court reasoned

> [s]ection 1115 says that "property of the estate includes, in addition to the property specified in section 541—(1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case," as well as "(2) earnings from services performed by the debtor after the commencement of the case." The *plain reading* of this statute is that "property of the estate," for purposes of Section 1115, includes property acquired and earnings earned after the debtor files his or her Chapter 11 petition, in addition to property specified in section 541.
>
>                    . . .
>
> Reading these statutes together, "property of the estate" for purposes of Section 1115 includes property and earnings acquired both before and after the commencement of the bankruptcy case.

465 B.R. at 322 (emphasis added); *see Tegeder*, 369 B.R. at 480 ("Since § 1115 broadly defines property of the estate to

include property specified in § 541, as well as property acquired post-petition and earnings from services performed post-petition, the [absolute priority] rule no longer applies to individual debtors who retain property of the estate under § 1115.").

The *Friedman* panel majority reached a similar conclusion based on its reading of the plain meaning of the words "included" and "in addition to" in § 1115:

> "Included" is not a word of limitation. To limit the scope of estate property in §§ 1129 and 1115 would require the statute to read "included, except for the property set out in Section 541" (in the case of § 1129(b)(2)(B)(ii)), and "in addition to, but not inclusive of the property described in Section 541" (in the case of § 1115).

> A *plain reading* of §§ 1129(b)(2)(B)(ii) and 1115 together mandates that the [absolute priority rule] is not applicable in individual chapter 11 debtor cases.

*Friedman*, 466 B.R. at 482 (emphasis added) (footnote omitted).

Other courts to adopt the "broad view" of the BAPCPA amendments, however, have done so while rejecting a plain-meaning approach. In *Shat*, for example, that bankruptcy court described the phrase "property included in the estate under section 1115" as "ambiguous" but nevertheless concluded that Congress intended to abrogate the absolute priority rule for individual debtors. *See* 424 B.R. at 863-68. The *Shat* court, relying on *Roedemeier*, reasoned that several other BAPCPA amendments to Chapter 11 demonstrate that Congress intended Chapter 11 procedures concerning individual debtors to function more like those found in Chapter 13. *Id.* at 867 (citing *Roedemeier*, 374 B.R. at 276). The *Roedemeier* court described the Chapter 11 amendments as "apply[ing]

only to individual debtors and [being] clearly drawn from the
Chapter 13 model." 374 B.R. at 275.

Independent of the changes made to the language of
§ 1129(b), the *Shat* court identified the following additional
amendments that, in its view, support the "broad view"
regarding absolute priority rule abrogation:

- changing the mandatory contents of a plan pursu-
  ant to § 1123(a)(8) to resemble § 1322(a)(1);

- adding the disposable income test of § 1325(b) to
  § 1129(a)(15);

- delaying the discharge until the completion of all
  plan payments as in § 1328(a);

- permitting discharge for cause before all pay-
  ments are completed pursuant to § 1141(d)(5),
  similar to the hardship discharge of § 1328(b);
  and

- the addition of § 1127(e) to permit the modifica-
  tion of a plan even after substantial consumma-
  tion for purposes similar to § 1329(a).

*Shat*, 424 B.R. at 862. The *Shat* court concluded that these
amendments were "part of an overall design of adapting vari-
ous chapter 13 provisions to fit in chapter 11." *Id.* at 868.
Accordingly, in its view, reading the amendments to
§ 1129(b)(2)(B)(ii) as eliminating the absolute priority rule
for individual debtors would be consistent with the perceived
Congressional intent to harmonize the treatment of the indi-
vidual debtor under Chapter 11 with those under Chapter 13,
which has no absolute priority rule.

In further support of their view that Congress intended to
make Chapter 11 operate for individual debtors similarly to

12                    In Re: Maharaj

Chapter 13, the *Shat* and *Friedman* courts noted that Congress drafted the new § 1115 to mirror § 1306(a) of the Code, which adds certain property to a § 541 bankruptcy estate in the Chapter 13 context. *See Friedman*, 466 B.R. at 482; *Shat*, 424 B.R. at 862. Both §§ 1115 and 1306 are similarly prefaced with the language "property of the estate includes, in addition to the property specified in section 541;" both also list, in like terms, post-petition acquired property and earnings. *See* 11 U.S.C. §§ 1115, 1306.

In addition, the *Shat* court noted its belief that "[t]he broader view . . . saves Section 1129(b)(2)(B)(ii) from an almost trivial reading," 424 B.R. at 868; a sentiment echoed by the court in *Roedemeier* when it noted "the narrow reading of the new exception in § 1129(b)(2)(B)(ii) would have little impact on . . . probably most . . . individual debtors'[ ] ability to reorganize in Chapter 11." 374 B.R. at 275. *See Tegeder*, 369 B.R. at 480, quoting Hon. William L. Norton, Jr., 4 Norton Bankruptcy Law & Practice 2d § 84A:1 ("A more narrow interpretation [of § 1129(b)(2)(B)(ii)] would cause this amendment to have little effect.").

On the other hand, over a dozen separate bankruptcy courts, including the court below, have adopted the "narrow view" and held that BAPCPA did not abrogate the absolute priority rule in its entirety for individual Chapter 11 debtors. *See In re Arnold*, ___ B.R. ___, 2012 WL 1820877 (Bankr. C.D. Cal. May 17, 2012); *In re Tucker*, 2011 WL 5926757 (Bankr. D. Or. 2011); *In re Borton*, 2011 WL 5439285 (Bankr. D. Idaho 2011); *In re Lindsey*, 453 B.R. 886 (Bankr. E.D. Tenn. 2011); *In re Kamell*, 451 B.R. 505 (Bankr. C.D. Cal. 2011); *In re Draiman*, 450 B.R. 777 (Bankr. N.D. Ill. 2011); *In re Maharaj*, 449 B.R. 484 (Bankr. E.D. Va. 2009); *In re Walsh*, 447 B.R. 45 (Bankr. D. Mass. 2011); *In re Stephens*, 445 B.R. 816 (Bankr. S.D. Tex. 2011); *In re Karlovich*, 456 B.R. 677 (Bankr. S.D. Cal. 2010); *In re Steedley*, 2010 WL 3528599 (Bankr. S.D. Ga. 2010); *In re Gelin*, 437 B.R. 435 (Bankr. M.D. Fla. 2010); *In re Mullins*, 435 B.R.

352 (Bankr. W.D. Va. 2010); *In re Gbadebo*, 431 B.R. 222 (Bankr. N.D. Cal. 2010).

In reaching these decisions, courts have stated differing rationales as to why the absolute priority rule remains valid in individual Chapter 11 cases. Beginning with *Gbadebo*, several of the above courts found that the language of § 1129(b)(2)(B)(ii) preserved the absolute priority rule in unambiguous terms. *See, e.g., Tucker*, 2011 WL 5926757 at *2; *Draiman*, 450 B.R. at 821 (relying on the "plain meaning" of § 1129(b)(2)(B)(ii)); *Walsh*, 447 B.R. at 48-49 (quoting *Gbadebo*, 431 B.R. at 229); *Steedley*, 2010 WL 3528599 at *2; *Mullins*, 435 B.R. at 360; *Karlovich*, 456 B.R. at 681; *Borton*, 2011 WL 5439285 at *4.

After discussing the contrary holding of *Shat*, the *Gbadebo* court, in frequently quoted language, stated

> [n]otwithstanding the thorough and thoughtful analysis by the *Shat* court, the Court is unable to agree with its conclusion. If the Court were writing on a clean slate, it would view the language of § 1129(b)(2)(B)(ii) as unambiguous. The Court would read the phrase "included in the estate under section 1115" to be reasonably susceptible to only one meaning: i.e., added to the bankruptcy estate by § 1115.

431 B.R. at 229.

*Lindsey, Kamell*, and *Gelin*, however, held that the language of § 1129(b)(2)(B)(ii) was ambiguous. *Lindsey* in particular noted that, if the statute were not ambiguous, "there would be no split of authority and the arguments in favor of each position [would not be] so diverse." 453 B.R. at 903. And both *Gelin* and *Kamell* noted the lack of direct (or helpful) legislative history for BAPCPA on the alteration of

§ 1129(b)(2)(B)(ii). *See Gelin,* 437 B.R. at 441; *Kamell,* 451 B.R. at 509.

A common thread running through many of the "narrow view" cases is that if Congress had intended to abrogate the absolute priority rule for individual Chapter 11 debtors, it would have done so in a far less convoluted way, particularly in light of the well established place of the absolute priority rule in bankruptcy jurisprudence. *See, e.g., Kamell,* 451 B.R. at 509. These cases note that if Congress had indeed had such an intent, it could have simply added the words "except with respect to individuals" at the beginning of § 1129(b)(2)(B)(ii). *Karlovich,* 456 B.R. at 682.

Other "narrow view" cases take issue with the claim found in "broad view" cases that Congress eliminated the absolute priority rule for individuals to harmonize Chapter 11 with Chapter 13. As the *Karlovich* court observed, "if that were Congress' intent, Congress would simply have amended the statutory debt ceilings for Chapter 13 cases set out in 11 U.S.C. § 109(e), and either eliminate them altogether or set them much higher." 456 B.R. at 682. Indeed, the court in *Lindsey* reasoned that preservation of the absolute priority rule was more consistent with Congressional intent in enacting the BAPCPA. "[T]he narrow interpretation [is] more in line with the primary purpose of BAPCPA to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors." 453 B.R. at 904 (quoting H.R. Rep No. 109-31, pt. 1, at 2) (internal quotation marks omitted); *see also Gbadebo,* 431 B.R. at 229 ("No one who reads BAPCPA as a whole can reasonably conclude that it was designed to enhance the individual debtor's 'fresh start.'").

The bankruptcy court below took a position in line with other "narrow view" cases. After discussing the position taken by the "broad view" courts that Congress may have intended

to harmonize Chapter 11's procedures for individual debtors
with those of Chapter 13, the bankruptcy court quoted *Mullins*
for the proposition that "that purpose would have been more
straight-forwardly expressed by simply stating 'except that in
a case in which the debtor is an individual, this provision shall
not apply,' rather than by awkwardly referring to § 1115."
*Maharaj*, 449 B.R. at 493 (citation omitted). The court further
echoed the view taken by the *Karlovich* court that if Congress
intended for Chapter 11 to operate the same as Chapter 13 in
the case of an individual debtor, "Congress would have sim-
ply amended the statutory debt ceilings for Chapter 13 cases
set out in 11 U.S.C. § 109(e), and either eliminate them alto-
gether or make them much higher." *Id.*

## II.

We now turn to the factual background of this case and the
proceedings below. Ganess and Vena Maharaj (hereinafter
"Debtors") are the owners and operators of an auto body
repair shop in Chantilly, Virginia. Between 2006 and 2008,
Debtors were the victims of an apparent fraud that left them
saddled with considerable debt. Because their debts exceeded
the limits for proceeding in bankruptcy under Chapter 13 of
the Code, they filed a voluntary petition for relief under Chap-
ter 11 in the U.S. Bankruptcy Court for the Eastern District
of Virginia.[6] Debtors have continued to own and operate their
auto body shop as debtors in possession throughout these pro-
ceedings.

---

[6]"Only an individual with regular income that owes, on the date of the
filing of the petition, noncontingent, liquidated, unsecured debts of less
than $360,475 and noncontingent, liquidated, secured debts of less than
$1,081,400, or an individual with regular income and such individual's
spouse, except a stockbroker or a commodity broker, that owe, on the date
of the filing of the petition, noncontingent, liquidated, unsecured debts that
aggregate less than $360,475 and noncontingent, liquidated, secured debts
of less than $1,081,400 may be a debtor under chapter 13 of this title." 11
U.S.C. § 109(e) (footnotes omitted).

In 2010, Debtors filed a Chapter 11 Plan of Reorganization
("the Plan") with the bankruptcy court. The Debtors' Plan
proposed segregating creditors into four classes: Class I repre-
sented a $3.5 million claim by Access Bank, secured by Debt-
ors' real property; Class II consisted of a claim held by an
automobile lender and secured by an interest in Debtors' vehi-
cle; Class III contained most general unsecured claims; and
Class IV consisted of Access Bank's unsecured claims. The
Plan provided that Debtors would continue to own and oper-
ate their auto body business and use income from the business
to pay the general unsecured claims of Class III creditors.

The Plan provided that Debtors would refinance their loan
agreements with Access Bank, the sole holder of claims in
Class I and IV. The automobile lender whose claim solely
comprised Class II was unimpaired by the Plan, as the Plan
provided that Debtors' daughter would continue to make pay-
ments pursuant to the terms of the automobile financing
agreement. The holders of general unsecured claims found in
Class III were impaired, with Debtors proposing to pay an
estimated 1.7 cents on the dollar over a period of five years
to those claims.

Ballots were distributed to the creditors impaired by the
Plan. Access Bank, the sole holder of claims in Class I and
Class IV, voted to approve the Plan. The Class II creditor did
not vote. Discover Bank, the holder of a relatively small Class
III unsecured claim, was the only other creditor to return a
ballot, and voted to reject the Plan.

Nevertheless, Debtors sought to have the district court
engage in a cram down to confirm the Plan over Discover
Bank's dissent. While acknowledging that under the absolute
priority rule, they would not be able to retain their auto body
business, Debtors argued that the bankruptcy court should
adopt the "broad view" of the BAPCPA amendments, and
hold that the absolute priority rule no longer applied to indi-
vidual Chapter 11 debtors. Debtors maintained that if they

were forced to comply with the absolute priority rule, they
would have to liquidate their business to effectuate a cram
down. Without their business, however, they would lack a
source of income, and be unable to make payments under the
Plan.

The bankruptcy court was not persuaded by Debtors' argu-
ments and agreed with those courts that have held that Con-
gress did not intend to abrogate the absolute priority rule in
the case of individual Chapter 11 debtors. Rather, the court
adopted the "narrow view" that the BAPCPA amendments
"merely allowed a debtor to keep post-petition earnings and
other property acquired after the commencement of the case."
*Maharaj*, 449 B.R. at 492 (citation omitted). Although the
court expressed considerable sympathy for Debtors' plight
and emphasized that neither the broad nor the narrow analysis
is "free from doubt," *id.* at 493, the court entered an order
denying confirmation of the Plan.

Debtors noted a timely appeal of the bankruptcy court's
order. On its own motion, the bankruptcy court certified its
order for direct appeal to this Court pursuant to 28 U.S.C.
§ 158(d)(2)(A)(i) (allowing a direct appeal when the judgment
"involves a question of law as to which there is no controlling
decision of the court of appeals for the circuit or of the
Supreme Court of the United States, or involves a matter of
public importance"). A panel of this Court then authorized
Debtors' direct appeal. *See id.*

### III.

This appeal presents a question of statutory interpretation,
which we review de novo. *E.E.O.C. v. Great Steaks, Inc.*, 667
F.3d 510, 519 (4th Cir. 2012). As we have emphasized,

> "[t]he starting point for any issue of statutory inter-
> pretation . . . is the language of the statute itself."
> *United States v. Bly*, 510 F.3d 453, 460 (4th Cir.

2007). "In that regard, we must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute . . . and our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Id.* (omission in original) (quoting *United States v. Hayes*, 453 F.3d 749, 752 (4th Cir. 2007), *rev'd on other grounds*, 555 U.S. 415 (2009) (internal quotation marks omitted). "We determine the 'plainness or ambiguity of the statutory language . . . by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. Thompson-Riviere*, 561 F.3d 345, 354-55 (4th Cir. 2009) (omission in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

*Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012). Furthermore, a statute is ambiguous if it "lends itself to more than one reasonable interpretation[.]" *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir. 2004). The matter of statutory ambiguity is an important one because "[i]f the statute is unambiguous, our inquiry into Congress' intent is at an end, for if the language is plain and the statutory scheme is coherent and consistent, we need not inquire further." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 191 (4th Cir. 2011) (internal quotation marks and citation omitted).

Accordingly, we begin our analysis by reference to the language of the BAPCPA, which we conclude is ambiguous because it is susceptible to more than one reasonable interpretation. We then look to the specific and broader context within which Congress enacted the BAPCPA, as well as a familiar canon of statutory construction, the presumption against implied repeal, and conclude that Congress did not intend to abrogate the absolute priority rule. Thus, notwith-

standing the ambiguity of the plain language of the relevant BAPCPA provisions, when the 2005 BAPCPA amendments are viewed in light of the specific context in which they were enacted and the broader context of the BAPCPA and the field of bankruptcy law, we arrive at the conclusion that Congress did not intend to alter longstanding bankruptcy practice by effecting an implied repeal of the absolute priority rule for individual debtors proceeding under Chapter 11. Finally, we consider, and reject, appellants' public policy contentions as unfounded.

### A.

To determine whether the statutes at issue here have a plain meaning, and are not ambiguous, we begin with the plain language of the provisions at issue, and note that we must read §§ 1115 and 1129(b)(2)(B)(ii) both individually and together. Specifically, we must determine the meaning of the Congressional language "property included in the estate under section 1115" found in § 1129(b)(2)(B)(ii) and "property of the estate includes, in addition to the property specified in section 541" found in § 1115.

There are two competing constructions of the "included in the estate" language. On one view, the phrase "included in" means the equivalent of "added to," since property of the estate has long been defined under § 541. On another view, however, this language "included in" means something closer to "referenced" in § 1115, in which case § 541 was merely "absorbed" and "superseded" into § 1115 for individual Chapter 11 debtors. *See, e.g., Kamell*, 451 B.R. at 509. On the face of the statute, either construction is plausible.

The same is true with respect to the "in addition to the property specified in section 541" language found in § 1115. Court-Assigned Amicus[7] in this case asks us to treat that lan-

---

[7]We thank court-assigned amicus counsel, the Appellate Litigation Program at Georgetown University Law Center, for its able representation of the bankruptcy court's position in this matter.

guage as a signpost, used only to note that § 541 property is already included in the bankruptcy estate, because it is set aside from the rest of § 1115 by a comma and a dash, indicating that it is "not essential" to the statute's meaning. Br. of Court-Assigned Amicus Counsel at 21. Stated differently, because § 541 independently includes all § 541 property in the estate, it would be a redundancy to "reinclude" that property through the § 1115 language. On the other hand, several bankruptcy courts have noted that a plausible reading of that language (coupled with the "included in the estate" language) indicates that § 541 operates in § 1115 as a subset of § 1115. *See, e.g., Friedman*, 466 B.R. at 482. By that construction, § 541 property, which is referenced by § 1115, is literally "property included in the estate under § 1115."

In light of the foregoing, we conclude that the language of § 1129(b)(2)(B)(ii) and § 1115 lends itself to more than one reasonable interpretation, and thus does not have a "plain" meaning. Perhaps the only thing that is clear and plain is that the courts that have considered this issue have arrived at plausible, competing arguments as to why their respective approaches are consistent with Congressional purpose in enacting BAPCPA. In short, the meaning of the BAPCPA amendments is anything but "plain." It is ambiguous. *See Friedman*, 466 B.R. at 485 (Jury, J., dissenting) ("[T]he meaning of the words is not plain. There can be more than one cogent interpretation of their meaning and intent[.]").

## B.

As we discussed above, in addition to analyzing the plainness or ambiguity the statute's language, we must also look to the specific context in which that language is used, and the broader context of the statute as a whole. In doing so, we find persuasive the argument that the amendment to § 1129(b)(2)(B)(ii) preserved the absolute priority rule as it operated prior to the passage of BAPCPA.

[P]rior to BAPCPA, property of the estate did not include post-petition acquired property and earnings for individuals and non-individuals alike. Hence, post-petition acquired property and earnings could be retained by a Chapter 11 debtor, individual and non-individual alike, without running afoul of the [absolute priority rule]. The addition of § 1115 potentially changed that by adding to the property of the estate of an individual post-petition acquired property and earnings. Without a corresponding change to § 1129(b)(2)(B)(ii), individual debtors could no longer retain post-petition acquired property and earnings if they wished to "cram down" a plan. By adding the language excepting the § 1115 property from the [absolute priority rule] of § 1129(b)(2)(B)(ii), Congress merely ensured that the [absolute priority rule] would be the same as it had been prior to BAPCPA and be the same for all Chapter 11 debtors. In other words, what Congress took from the individual debtor with its § 1115—hand, it returned for application of the [absolute priority rule] with its § 1129(b)(2)(B)(ii)-hand.

*Karlovich*, 456 B.R. 677, 681. In this respect we do not agree with the claim, advanced by some of the "broad view" courts, *e.g.*, *Tegeder*, 369 B.R. at 480, that a narrow reading of the amendments renders § 1115 trivial. To the contrary, the "narrow view" of § 1115 "brings post-petition acquired property into the estate, thereby extending the automatic stay in Chapter 11 cases to an individual debtor's postpetition earnings and subject[ing] those earnings to the various tests for confirmation of the Chapter 11 plan." *Gelin*, 437 B.R. at 442 (citation omitted). At the same time, § 1129(b)(2)(B)(ii) permits the debtor to retain that property during the Chapter 11 proceeding and not put it at risk in a cram down analysis.

In our view, the context demonstrates that Congress intended § 1115 to add property to the estate already estab-

22                         In Re: MAHARAJ

lished by § 541. This position is supported by the Sixth Circuit's holding in *In re Seafort*, 669 F.3d 662 (6th Cir. 2012), in which the court interpreted § 1306(a)—the parallel Chapter 13 provision to § 1115.[8] The Sixth Circuit interpreted the statute as follows: "Section 1306(a) expressly incorporates § 541. Read together, § 541 fixes property of the estate as of the date of filing, while § 1306 adds to the 'property of the estate' property interests which arise post-petition." *Seafort*, 669 F.3d at 667.

                              C.

Strongly supporting our conclusion that the BAPCPA amendments did not abrogate the absolute priority rule is the Supreme Court's view, especially in the bankruptcy context, that implied repeal is strongly disfavored. Indeed, Debtors concede that adoption of their position would represent a significant departure from pre-BAPCPA bankruptcy practice. *See* Debtors' Opening Br. at 18 ("[E]limination of the absolute priority rule represents a significant change from pre-BAPCPA law.").

As a general matter, "'repeals by implication are not favored,' and therefore, 'the intention of the legislature to repeal must be clear and manifest.'" *The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 338 (4th Cir. 2007) (quoting *TVA v.*

---

[8] 11 U.S.C. § 1306(a) provides:

Property of the estate includes, in addition to the property specified in section 541 of this title—

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first; and

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

*Hill*, 437 U.S. 153, 189 (1978)); *see Hui v. Castaneda*, 130 S. Ct. 1845, 1853 (2010) ("As we have emphasized, repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest." (quoting *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009))).

The canon against implied repeal is particularly strong in the field of bankruptcy law. In interpreting the Code, we are mindful that courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Hamilton v. Lanning*, 130 S. Ct. 2464, 2467 (2010); *see also Hall v. United States*, ___ S. Ct. ___, No. 10-875, 2012 WL 1658456, Slip op. at 11 (May 14, 2012) (same) (citing *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998)); *cf. Midlantic Nat. Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) (citing *Swarts v. Hammer*, 194 U.S. 441, 444 (1904)) ("If Congress wishes to grant the trustee an extraordinary exemption from nonbankruptcy law, the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt."); *Palmer v. Massachusetts*, 308 U.S. 79, 85 (1939) ("If this old and familiar power of the states was withdrawn when Congress gave district courts bankruptcy powers over railroads, we ought to find language fitting for so drastic a change."); *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1382 (5th Cir. 1986) ("We think it unlikely that Congress would have adopted such a rule—entailing, as it does, major changes in the way in which a reorganization proceeding is conducted—without clear, unequivocal statements to that effect in the bankruptcy statute, or, at least, in its legislative history.").

In discussing whether Congress, in enacting the Chandler Act of 1938, intended to extend the jurisdiction of bankruptcy courts over certain mortgage lien enforcement actions, the Supreme Court worried that "[i]f [the statute] is read to extend the power of the bankruptcy court to the present situation, the

　　　　　　　In Re: Maharaj

four month period [governing the delivery of certain property to the bankruptcy court] will have acquired a new significance in bankruptcy law." *In re John M. Russell, Inc.*, 318 U.S. 515, 521 (1943). The Court continued: "[w]e cannot help but think that if Congress had set out to make such a major change, some clear and unambiguous indication of that purpose would appear." *Id.*

Below, we discuss the ambiguous language of the statute and sparse legislative history and conclude that Congress made no clear statement of repeal. We go on to consider, and reject, Debtors' and their amici's contention that Congress repealed the absolute priority rule with the intent of harmonizing Chapter 11 and Chapter 13 for individual debtors.

1.

Looking to the text of both §§ 1129(b)(2)(B)(ii) and 1115, we find no clear indication that Congress intended to abrogate the longstanding absolute priority rule for individual Chapter 11 debtors. As we discussed above, the language at issue is ambiguous, and we are unable to draw from it a clear Congressional intent to abrogate the rule. To the contrary, we are in agreement with those courts that have concluded that, if Congress intended to abrogate such a well-established rule of bankruptcy jurisprudence, it could have done so in a far less convoluted manner. As the *Kamell* court persuasively observed:

> [T]he [absolute priority rule] or something very like it has been acknowledged as far back as at least the 1890's. It has long been held that major changes to existing practice will not be inferred unless clearly mandated. Further, as observed by the U.S. Supreme Court when it upheld application of the [absolute priority rule] in *Norwest Bank Worthington v. Ahlers*, despite the newly enacted Chapter 12, "where, as here, Congress adopts a new law . . . it normally can

> be presumed to have had knowledge of the interpre-
> tation given to the old law." From such awkward and
> convoluted language the court cannot infer that Con-
> gress truly intended such a wide and important
> change in individual Chapter 11 practice as discard-
> ing the [absolute priority rule].

451 B.R. at 509-10 (internal citations, alterations, and quota-
tion marks omitted).[9]

Similarly, there is simply no clear indication from the lan-
guage of either §§ 1129(b)(2)(B)(ii) or 1115 that Congress
intended such a dramatic departure from pre-BAPCPA bank-
ruptcy practice. Absent such a clear statement, we must
refrain from adopting the "broad view" and cannot conclude
that the absolute priority rule has been abrogated for individ-
ual debtors in a Chapter 11 proceeding.

Furthermore, there is nothing in the BAPCPA's legislative
history that suggests that Congress intended to repeal the
absolute priority rule. To say the least, that would be an odd
occurrence for such a significant change. As many courts in
a variety of contexts have noted, BAPCPA's legislative his-
tory is sparse. *See, e.g., In re Jass,* 340 B.R. 411, 416 (Bankr.
D. Utah 2006) (internal citation and quotation marks omitted)
(noting that "the Congressional record is largely silent
because the only records available are little more than a gloss
of the statutory language of BAPCPA"); *In re Davis,* 348 B.R.
449, 457 (Bankr. E.D. Mich. 2006) (describing BAPCPA's
legislative history as "scant"). A glean of the Congressional
record reveals that there is simply no indication whatsoever

---

[9]In addition, as at least one bankruptcy court has noted, the "broad
view" of the BAPCPA amendments may render certain parts of the Code
superfluous. "The language 'in addition to the property specified in section
541' . . . would render surplusage the words 'all property of the kind spec-
ified in section 541' in Section 1115(a)(1), if Section 1115 is interpreted
to include all property of the estate." *Stephens,* 445 B.R. at 820-21.

that Congress intended to repeal the absolute priority rule for individual debtors.

The lack of any clear statement, either in the text of § 1129(b)(2)(B)(ii) or the legislative history of BAPCPA, is fatal to the "broad view" for at least two reasons. First, as Court-Assigned Amicus Counsel notes, Congress does discuss in the BAPCPA legislative history instances where BAP-CPA changes longstanding bankruptcy practice. *See* H.R. Rep. 109-31(I) at *97. But in the section of the legislative history appearing beneath the label "Consumer Creditor Bankruptcy Protections" there is simply no mention whatsoever of abrogation of the absolute priority rule. This Congressional silence is telling.

Second, the "narrow view" is supported by the history of the absolute priority rule, as described at the outset of our opinion. When Congress amended the Act in 1952 to eliminate the "fair and equitable" requirement, it clearly explained its actions in the accompanying legislative history. Not only did Congress amend the Act to state that plan confirmation shall not be refused because "the interest of a debtor . . . will be preserved under the arrangement," but Congress explained itself in the Congressional Record: "[T]he fair and equitable rule . . . cannot realistically be applied[.]" *See* H.R. Rep. 82-2320. History shows that Congress knows how to abrogate the absolute priority rule, and it has not done so here.

2.

Nor are we persuaded by the contention, advanced by Debtors and their amici, that all the foregoing is overridden because abrogation of the absolute priority rule for individual Chapter 11 debtors is congruent with the Congressional goal of harmonizing Chapter 11 proceedings for individuals with those in Chapter 13. They note that prior to 2005, individual debtors had the option of proceeding under Chapter 7, in which case the debtor could retain certain exempt property

and obtain a discharge of debt. BAPCPA, however, amended Chapter 7 to include a means test as a barrier for the use of Chapter 7 by some debtors. 11 U.S.C. § 707(b). Thus, debtors earning over a certain median income must either proceed under Chapter 11 or Chapter 13. Debtors who are unable to utilize Chapter 7, and whose debts exceed the limits found at § 109(e), must proceed under Chapter 11. According to the argument advanced by Debtors and their amici, the Congressional goal of forcing certain debtors who would otherwise proceed under Chapter 7 to repay their creditors from their disposable income would be thwarted if Chapter 11 was not a viable alternative for those ineligible for Chapter 13. Br. of Amicus NACBA at 14.

Putting aside for now the difficulty of assuming that Congress intended such a sea change without a clear statement either in the Code or the legislative history, we are still not persuaded that Congress intended to do so. First, we again encounter the problem that Congress could have effected the changes that Debtors argue it sought in a far less awkward and convoluted manner by simply raising the Chapter 13 debt limits and making additional individuals eligible to proceed under that chapter. *See Karlovich*, 456 B.R. at 682; *see also Mullins*, 435 B.R. at 360-61 ("[I]f it had been the intent of Congress to eliminate entirely the operation of the [absolute priority rule] from individual chapter 11 cases, it would have been much clearer, easier and more direct for it to have said simply in § 1129(b)(2)(B)(ii) 'except that in a case in which the debtor is an individual, this provision shall not apply' in lieu of the language which it did use . . . .").

More importantly, however, we are not in accord with those courts adopting the "broad view" on the supposition that Congress was necessarily attempting to make Chapter 11 for individuals function in all respects more like Chapter 13. As the *Gbadebo* court observed:

> Each one of these new provisions appears designed to impose greater burdens on individual chapter 11

28                    In Re: Maharaj

debtors' rights so as to ensure a greater payout to
creditors. This was a frequently expressed overall
purpose of BAPCPA: i.e., to ensure that debtors who
can pay back a portion of their debts do so. No one
who reads BAPCPA as a whole can reasonably con-
clude that it was designed to enhance the individual
debtor's "fresh start."

The *Shat* Court asserts that the [absolute priority
rule] makes it virtually impossible for an individual
Chapter 11 debtor to confirm a plan that does not
provide for payment in full to the holders of unse-
cured claims. To the contrary, such a plan may be
confirmed if the holders of such claims vote in favor
of the plan. They are likely to do so if a reasonable
dividend is proposed, and they conclude that they
will receive no dividend in a Chapter 7 case.

431 B.R. at 229-30. It may well be that Congress intended in
some respects to harmonize the provisions of Chapter 11 as
they relate to individual debtors with those of Chapter 13.
However, neither the language of the statute nor the legisla-
tive history of BAPCPA compels such a conclusion, and
much less so that Congress intended such a dramatic change
in bankruptcy law as abrogation of the absolute priority rule.

D.

Because we conclude, based on our analysis of the specific
and broader context of the BAPCPA, that Congress did not
intend to repeal the absolute priority rule for individual debt-
ors in Chapter 11 cases, we are not obligated to consider
Debtors and amici's public policy arguments. *Cf. Hall,* Slip
op. at 16 ("[T]here may be compelling policy reasons for
treating postpetition income tax liabilities as dischargable. But
if Congress intended that result, it did not so provide in the
statute."). Even were public policy considerations pertinent to
our decision, however, we do not agree that public policy nec-

essarily supports Debtors' interpretation of the Code. More-
over, in view of the strong arguments recited above
supporting the "narrow view," relying on a vague public pol-
icy rationale would be the weakest of reeds upon which to
reach a contrary conclusion.

Debtors' primary contention on appeal with respect to pol-
icy is that continued application of the absolute priority rule
for individual Chapter 11 debtors makes it more difficult to
confirm a plan of reorganization, contrary to the goals of
Chapter 11. The rule, the argument goes, is antithetical to the
aims of Chapter 11 because if a debtor who is a sole propri-
etor is forced to sell a business that is a sole source of income,
the debtor will have insufficient means to fund payments
under the plan.

First, as noted above, we do not agree that Congress, in
enacting BAPCPA, necessarily intended to provide greater
benefits to debtors as compared to protections for creditors.
The second full paragraph of the House Report on BAPCPA
describes the BAPCPA amendments in favor of the interests
of creditors:

> the proposed reforms respond to many of the factors
> contributing to the increase in consumer bankruptcy
> filings, such as lack of personal financial account-
> ability, the proliferation of serial filings, and the
> absence of effective oversight to eliminate abuse in
> the system. The heart of the bill's consumer bank-
> ruptcy reforms consists of the implementation of an
> income/expense screening mechanism ("needs-based
> bankruptcy relief" or "means testing"), which is
> intended to ensure that debtors repay creditors the
> maximum they can afford. S. 256 also establishes
> new eligibility standards for consumer bankruptcy
> relief and includes provisions intended to deter serial
> and abusive bankruptcy filings. It substantially aug-
> ments the responsibilities of those charged with

administering consumer bankruptcy cases as well as
those who counsel debtors with respect to obtaining
such relief. In addition, the bill caps the amount of
homestead equity a debtor may shield from creditors,
under certain circumstances.

H.R. Rep. No. 109-31(I), *89. The next paragraph, discussing
the additional consumer protections found in BAPCPA, is
silent with respect to the absolute priority rule. It is for this
reason that we agree with the *Gbadebo* court's assessment
that "[n]o one who reads BAPCPA as a whole can reasonably
conclude that it was designed to enhance the individual debt-
or's 'fresh start.'" 431 B.R. at 229.

We also reject Debtors' argument that retention of the
absolute priority rule for individual debtors makes confirma-
tion impossible. The absolute priority rule unquestionably
applied to individuals from 1978 to 2005, and during that time
classes of unsecured creditors were always able to take advan-
tage of the rule to veto confirmation of a plan where a debtor
sought to retain property. *See Ahlers*, 485 U.S. at 202 ("There
is little doubt that a reorganization plan in which respondents
retain an equity interest in [their] farm is contrary to the
[absolute priority rule]."). "Faced with statutory silence, we
presume that Congress is aware of the legal context in which
it is legislating." *Palisades Collections LLC v. Shorts*, 552
F.3d 327, 334 n.4 (4th Cir. 2008) (internal alterations omit-
ted); *see Hall*, Slip op. at 16 ("When Congress amends the
bankruptcy laws, it does not write on a clean slate.") (quoting
*Dewsnup v. Timm*, 502 U.S. 410, 419 (1992)) (internal quota-
tion marks omitted). Debtors would have us hold that Con-
gress decided to address this "harsh" outcome in the most
oblique way possible, and yet omit any mention of this rem-
edy from the legislative history. That, we are not prepared to
do.

Moreover, we remain unconvinced that the doom and
gloom scenario presented by Debtors is an accurate picture of

the state of bankruptcy law. Debtors assume that, if the absolute priority rule is left intact, consensual confirmation is virtually impossible. To the contrary, plan acceptance is still very much a possibility, even within the confines of the absolute priority rule. Debtors "may negotiate a consensual plan, pay higher dividends, pay dissenting classes in full, or comply with the [absolute priority rule] by contributing prepetition property." *Friedman*, 466 B.R. at 491 (Jury, J., dissenting) (citing *Kamell*, 451 B.R. at 512; *Gbadebo*, 431 B.R. at 229-30).

IV.

As the bankruptcy court below observed, no analysis of this issue is "free from doubt." However, for the reasons set forth above, we believe that Congress did not intend to abrogate the absolute priority rule for individual Chapter 11 debtors. The dramatic nature of such a departure from longstanding pre-BAPCPA law, the ambiguous language of the statutes, and the total lack of any indication in the legislative history of such an intent, lead us to conclude that Congress intended to and did preserve the absolute priority rule. Congress knows how to eliminate or partially abrogate the absolute priority rule; it has done so before, but did not do so again in BAPCPA.

Accordingly, we conclude that the absolute priority rule as it applies to individual debtors in Chapter 11 has not been abrogated by BAPCPA, and we affirm the bankruptcy court's order denying plan confirmation.

*AFFIRMED*